14-1493

_____

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

P.R.S. Mediterranean Ltd.

*Applicant-Appellant,*

v.

Reynolds Consumer Products, Inc.

*Opposer- Appellee.*

_____

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Opposition No. 91/189,669

_____

Appellant's Principal Brief

Richard M. Klein
Fay Sharpe LLP
The Halle Building, Fifth Floor
1228 Euclid Avenue
Cleveland, Ohio 44115
(216) 363-9000

July 21, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant P.R.S. Mediterranean Ltd. certifies the following:

1.    The full name of every party represented by me is:

      P.R.S. Mediterranean Ltd.

2.    The names of the real parties in interest are:

      P.R.S. Mediterranean Ltd.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are:

      None

4.    The names of all law firms and the partners or associates that appeared for the parties now represented by me in the trial court or are expected to appear in this Court are:

      Richard M. Klein
      George P. Huang
      FAY SHARPE LLP
      The Halle Building, Fifth Floor
      1228 Euclid Avenue
      Cleveland, Ohio 44115

Date: July 21, 2014      /s/Richard M. Klein
                                Richard M. Klein

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF RELATED CASES ................................................... vii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE ..................................................................1

STATEMENT OF THE FACTS ................................................................9

SUMMARY OF THE ARGUMENT ......................................................18

ARGUMENT ..........................................................................................21

    I.     The Standard of Review ....................................................21

    II.    The NEOWEB and GEOWEB marks are different in
          appearance, sound, connotation, and commercial
          impression. ........................................................................21

    III.   The GEOWEB trademarks have a narrow scope that does
          not reach the NEOWEB mark.............................................29

    IV.   Purchasers of geocells are sophisticated and exercise
          care. ....................................................................................35

    V.    The NEOWEB products are different. ................................36

VI.    There is no actual confusion....................................................37

VII.    There is no bad faith...........................................................38

## TABLE OF AUTHORITIES

**Cases**

*Bose Corp. v. QSC Audio Prods.*,

    293 F.3d 1367 (Fed Cir. 2002) ...................................................................29

*Century 21 Real Estate Corp. v. Century Life of America*,

    970 F.2d 874 (Fed. Cir. 1992) ...................................................................22

*Citigroup Inc. v. Capital City Bank Group Inc.*,

    637 F.3d 1344 (Fed. Cir. 2011) ...................................................................23

*Claremont Polychemical Corp. v. Atlantic Powdered Metals, Inc.*,

    470 F.2d 636 (CCPA 1972) ...................................................................23

*Clark Equip. Co. v. Baker-Lull Corp.*,

    288 F.2d 926 (CCPA 1961) ...................................................................33

*Elec. Design & Sales Inc. v. Elec. Data Sys. Corp.*,

    954 F.2d 713 (Fed. Cir. 1992) ...................................................................36

*Georgia-Pacific Corp. v. Great Plains Bag Co.*,

    614 F.2d 757 (CCPA 1980) ...................................................................38

*Giant Food, Inc. v. Nation's Foodservice, Inc.*,

    710 F.2d 1565 (Fed. Cir. 1983) ...................................................................22

*Gulf States Paper Corp. v. Crown Zellerbach Corp.*,

    471 F.2d 795 (CCPA 1969) ...................................................................26

*Hewlett-Packard Co. v. Packard Press, Inc.*,

    281 F.3d 1261 (Fed. Cir. 2002) ................................................................22

*In re Chippendales USA Inc.*,

    622 F.3d 1346 (Fed. Cir. 2010) ................................................................29

*In re E.I. DuPont de Nemours & Co.*,

    476 F.2d 1357 (CCPA 1973)......................................................................3

*In re Nat'l Distillers and Chem. Corp.*,

    297 F.2d 941 (CCPA 1962)......................................................................22

*In re Natl'l Data Corp.*,

    753 F.2d 1056 (Fed. Cir. 1985) .......................................................... 22, 23

*In re Viterra*,

    671 F.3d 1358 (Fed. Cir. 2012) ................................................................21

*Institut Nat'l Des Appellations D'Origine v. Vinters Int'l Co.*,

    958 F.2d 1574 (Fed. Cir. 1992) ................................................................31

*Kassbaum v. Steppenwolf Productions Inc.*,

    236 F.3d 487 (9th Cir. 2000) ....................................................................27

*Kimberly-Clark Corp. v. H. Douglas Enter., Ltd.*,

    774 F.2d 1144 (Fed. Cir. 1985) ................................................................34

*Lever Brothers Co. v. Babson Bros. Co.*,

    197 F.2d 531 (CCPA 1952).......................................................................26

*Long John Distilleries, Ltd. v. Sazerac,*

    426 F.2d 1406 (CCPA 1970) ........................................................................23

*Milwaukee Nut Co. v. Brewster Food Serv.,*

    277 F.2d 190 (CCPA 1960) ..........................................................................33

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,*

    396 F.3d 1369 (Fed. Cir. 2005) ...................................................................22

*Quaker Oats Co. v. General Mills, Inc.,*

    134 F.2d 429 (7th Cir. 1943) .......................................................................22

*Shen Manufacturing Co. v. Ritz Hotel Ltd.,*

    393 F.3d 1238 (Fed. Cir. 2004) ...................................................................34

*Smith v. Tobacco By-Products & Chemical Corp.,*

    243 F.2d 188 (CCPA 1957) ..........................................................................26

*Specialty Brands Inc. v. Coffee Bean Distribs., Inc.,*

    748 F.2d 669 (Fed. Cir. 1984) .....................................................................34

*The Wooster Brush Co., v. Prager Brush Co.,*

    231 USPQ 316 (TTAB 1986) ........................................................................32

**Statutes**

15 U.S.C § 1063 ..............................................................................................1

15 U.S.C § 1067 ..............................................................................................1

28 U.S.C. 1295(a)(4)(B) ...................................................................................1

## **STATEMENT OF RELATED CASES**

No appeal from this proceeding was previously before this or any other appellate court.  No other cases are known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This is an appeal of a final decision of the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("USPTO"). The USPTO and TTAB had jurisdiction under 15 U.S.C § 1063 and 15 U.S.C § 1067. This Court has jurisdiction under 28 U.S.C. 1295(a)(4)(B).

The final decision by the TTAB was mailed on September 27, 2013. A request for reconsideration was timely filed on October 28, 2013, and was denied in an opinion mailed on February 14, 2014. The appeal to this Court was timely filed on April 9, 2014.

## STATEMENT OF THE ISSUES

1. Did the Trademark Trial and Appeal Board err in finding that the mark NEOWEB was likely to be confused with the registered GEOWEB trademarks under 15 U.S.C. § 1052(d), as applied to three-dimensional polymeric cells, cellular confinement systems, and expandable plastic webbing sheets?

## STATEMENT OF THE CASE

Appellant P.R.S. Mediterranean Ltd. ("PRS") seeks to register the mark NEOWEB, and has filed U.S. Trademark Application Serial No. 77/248,825, in

International Class 019 for use with, in relevant part, three-dimensional polymeric cells, cellular confinement systems, and expandable plastic webbing sheets. Such products are also known as geocells.

Appellee Reynolds Consumer Products, Inc., doing business as Presto Geosystems ("Presto"), owns two trademark registrations including the mark GEOWEB. Presto's U.S. Trademark Registration No. 1,351,682 is to the word mark GEOWEB for use with "road base and ground support plastic webbing sheets for building roads and preventing erosion of roads." Presto's U.S. Trademark Registration No. 3,699,433 is to a design mark for use with, in relevant part, "construction materials, namely, plastic erosion control and protection blocks, sheets, mats and webbing for use in constructing roadways, … and for ground and soil stabilization." The design mark is reproduced below, and the colors blue (the design and the letters GEO) and green (the letters WEB) are claimed as a feature of the mark:



Presto instituted an opposition proceeding alleging that the NEOWEB mark was likely to be confused with its two GEOWEB trademarks, and that the NEOWEB mark would dilute its GEOWEB trademarks.

In its trial brief, PRS discussed several of the factors outlined in *In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973) ).

PRS first argued that the GEOWEB trademarks had very little scope due to the descriptiveness of the "GEO" and "WEB" elements. The GEO- prefix was commonly used in the industry and was understood to refer to the earth or ground, which the goods were used with. The -WEB suffix referred to the structure of the good, and the phrase "webbing" was used in the recitation of goods and services for the GEOWEB trademarks. Numerous other geocell suppliers also used the WEB suffix in marks for their products, such as MIRAWEB, STRATAWEB, PARAWEB, and TENWEB. This illustrated that the WEB suffix had a normally understood meaning in the trade. Because GEO- and -WEB were both weak descriptive terms, the overall GEOWEB mark would have little scope.

Next, PRS argued that the sight, sound, meaning, and overall commercial impression was different. As to sight, the NEOWEB mark began with the letter N, which was visually distinguishable from the letter G with which the GEOWEB mark began. The first syllable of each mark, NEO and GEO, was aurally distinguishable. Finally, the NEO- prefix had a recognized connotation of new and different, giving the NEOWEB mark a connotation of a new and different product, from a new and different source. The GEOWEB mark had the connotation of a

webbing used in or with the ground.  Because of these differences, this *DuPont* factor weighed against a likelihood of confusion.

PRS next presented evidence that the purchasers of the goods were sophisticated and used a high degree of care.  Geocells are industrial / business goods, not purchased at retail or by the general public.  The purchasers are specialized individuals working for engineering companies, construction firms, site developers, and distributors.  Geocells are typically used in high-value projects such as long-term road support which require a large time investment of months to years, and the construction company must make long-term guarantees, increasing their liability.  This increases the purchaser's motivation to understand the product thoroughly.  The purchasing process is slow and customarily requires comparison of specifications containing a high amount of technical information concerning mechanical and chemical properties.  Months to years may be needed to make a purchasing decision.  Geocells are also very expensive, with total purchases for a single project potentially being over $1 million.  Due to these factors, the purchase is not casual or impulsive, and a high degree of care is taken.  As a result, this *DuPont* factor weighed against a likelihood of confusion.

PRS also argued that Presto's GEOWEB trademarks were not famous, for purposes of the likelihood of confusion analysis or the dilution analysis.  In this regard, Presto only provided some copies of its advertisements and alleged

4

worldwide sales of ten million dollars over thirty years in its Trial Brief.  However, Presto did not provide any evidence in the record for its worldwide sales and did not provide any context, such as comparison data for other geocell products or information on how many people may have seen its advertisements.  When Presto's unsubstantiated sales volume and advertising expenditures were compared to those of other cases decided by the TTAB or this Court, the GEOWEB trademarks could not be considered famous.

In the remaining sections of its trial brief, PRS argued that the goods were different, that there was no actual confusion, and that there was no bad faith intent to confuse.

In an opinion mailed September 27, 2013, the Trademark Trial and Appeal Board ("TTAB") sustained the opposition and refused registration of the NEOWEB mark.  A00011-A00045.  In its opinion, the TTAB reviewed the *DuPont* factors and its application thereof.

The TTAB first held that PRS's and Presto's goods were legally identical, would be sold in the same trade channels, and would be bought by the same classes of purchasers.  According to the TTAB, these factors weighed in favor of a likelihood of confusion.  A00037-A00038.

Next, the TTAB discussed the renown of Presto's marks.  Although Presto had only alleged a worldwide sales figure in its Trial Brief without providing any

evidence thereon, for reasons unknown, the TTAB accepted the alleged sales figure. However the TTAB found no context for the numbers and nothing about the parties' respective market share. The TTAB thus found that the evidence did not demonstrate fame, but did confirm GEOWEB as a well-established brand sufficient to accord it a slightly wider scope of protection despite any conceptual weakness. A00038-A00039.

The TTAB then discussed the strength of the GEOWEB trademarks. Although both the GEO- prefix and the -WEB suffix were used by third-party competitors, none had adopted a mark as similar to Presto's GEOWEB trademarks as PRS's applied-for NEOWEB mark. The TTAB noted that whatever conceptual weakness might be inherent in selecting the mark GEOWEB for a good described as "webbing", they would accord a scope of protection to which the GEOWEB trademarks were rightly entitled. A00039.

Next, the TTAB held that the marks were similar in appearance, sound, connotation, and commercial impression. The two marks were identical except for their first letter, and were strikingly similar in sound. As to connotation, GEO- had the suggestion of "earth", while NEO- had a meaning of "new" or "revised". However, the TTAB felt that prospective customers might view "NEO-" as an intentional play on the word "GEO-", especially because PRS touted its NEOWEB product as a later generation of products that improved significantly upon

GEOWEB products.    The TTAB described the combination of identical pronunciations and structure, and "an almost intuitive connection to the earlier product", as creating a close association between the overall commercial impressions of the two marks used in a marketplace of legally identical, competing products.    Thus, the TTAB held that the marks were very similar, and found this *DuPont* factor weighed in favor of likelihood of confusion.    A00040-A00041.

The TTAB then addressed the sophistication of the purchaser.    Recognizing the expense of the product in specific projects, that engineers review product specifications, and the time needed to make such purchases, the TTAB held that care would be exercised by sophisticated purchasers.    This *DuPont* factor weighed against likelihood of confusion.    A00041-A00042.

Finally, the TTAB addressed some miscellaneous arguments, holding that there was no bad faith or intent to confuse by either party.    A00042-A00044.

In its balancing of the *DuPont* factors, the TTAB held that the factors in favor of a likelihood of confusion outweighed those against likelihood of confusion.    Thus, confusion was likely between Presto's GEOWEB trademarks and the NEOWEB mark.    The TTAB noted that if there was any doubt, such doubt was resolved in favor of the prior registrant.    The TTAB also held that dilution could not occur because the GEOWEB trademarks were not famous.    A00044-A00045.

PRS timely filed a request for reconsideration on October 28, 2013. In the request, PRS submitted three grounds for reconsideration. First, PRS submitted that in considering connotation and commercial impression, the TTAB only compared the NEOWEB mark to the GEOWEB trademark, rather than to all products in the commercial marketplace. In this regard, the prefix NEO- had the meaning of "new" and "different" compared to "old" geocell products. When compared to all products, there was no "almost intuitive" connection between NEOWEB and GEOWEB, but rather a connotation that NEOWEB was new and different from all other geocells in the marketplace. This connotation of "new and different" also carries over to the source of the product, i.e. the supplier is new and different from all other suppliers.

Next, PRS alleged that three expired registrations no longer in use, AEROWEB, PARAWEB, and MIRAWEB, should have been considered. These registrations are competent to show that others in the industry have adopted and registered marks containing the term -WEB and the meaning of this term relating to the shape of the product, as described in *Plus Products v. Star-Kist Foods, Inc.*, 220 USPQ 541 (TTAB 1983) and *Henry Siegel Co. v. M & R Int'l Mfg. Co.*, 4 USPQ2d 1154 (TTAB 1987). This is relevant to the question of how much scope the registered GEOWEB trademarks should be given.

Finally, the TTAB had incorrectly considered the appearance and sound of the NEOWEB and GEOWEB marks.  Specifically, of the twenty-six possible three-letter prefixes ending in –eo (i.e. "Aeo-", "Beo-", "Ceo-", etc.), only "Geo-" and "Neo-" had any relevant connotation to the recited goods.  This was not a situation where PRS's mark differed slightly from an arbitrary mark, but rather a situation where PRS desired to suggest a concept, "Neo-", which happened to share similar letters with a different concept.  It was as a result of the connotation that the appearance and sound were similar, and as a result this similarity in appearance and sound should be discounted.

The request for reconsideration was denied in an opinion mailed February 14, 2014.  In the opinion, the TTAB stated that its decision had considered marketplace conditions under the *DuPont* factors.  A00046-A00054.

## STATEMENT OF THE FACTS

Geosynthetic products are polymeric materials used to reinforce the earth or soil in different ways.[1]  A03882 (16-18), A3883 (17-22), A04181 (6-11).

---

[1] As part of discovery, deposition testimony was taken from a third party witness, Chip Fuller, currently President of Strata Systems, Inc., who has been part of the geosynthetics industry since the 1970's, and who had previously distributed both GEOWEB and NEOWEB products, as well as distributing his own STRATWEB geocell product. A03658, A03689, A03758.

Geosynthetic products include geocells, geogrids, geotextiles, geomembranes, geosynthetic clay liners, geocomposites, geonets, and geofoams. A03782-A03784, A03793-A03795.

Appellant PRS and Appellee Presto each manufacture and sell geocells, also known as cellular confinement systems. A geocell is a three-dimensional honeycombed cellular structure formed from plastic strips that are welded together at intervals in an offset manner to form a web or webbing. This permits the structure to be collapsed during shipping, and then expanded into the cellular structure. When the webbing or cells are filled with soil or earth or other geo-related material, and then compacted, the material is confined by the webbing and becomes very stiff and strong. A03661 (2-10), A03877 (14-23), A03886 (8-12). Two pictures showing a geocell in use are provided below:





Top view of geocell                    geocell being filled with infill

Appellant PRS seeks to register the mark NEOWEB in International Class 19 for use with geocells. Appellee Presto opposes registration based on its two trademark registrations including the mark GEOWEB, U.S. Trademark Registration Nos. 1,351,682 (for the word mark) and 3,699,433 (for a design mark), also in International Class 19 for use with geocells.

As acknowledged by both parties, the term GEOWEB is formed by the coalescence of two terms, GEO and WEB. Trial Brief for Opposer, page 21. This is even noted by Presto in the GEOWEB design mark, where the term GEO is in blue and the term WEB is in green.



The prefix GEO- is from the Greek meaning "earth," "soil," or "ground," and is commonly used in the English language, for example in the words **geo**logy, **geo**thermal, etc.

The GEO prefix is commonly used in the **geo**synthetics industry. Again, various geosynthetic products include **geo**cells, **geo**grids, **geo**textiles, **geo**membranes, **geo**synthetic clay liners, **geo**composites, **geo**nets, and **geo**foams.

Third party witness Chip Fuller testified that the prefix GEO is used extensively in the industry to identify products that are used in the soil.  A03796 (6-12).

Many businesses in the geosynthetics industry identify themselves with words including the GEO prefix. For example, **Geo** Products LLC is a Texas-based company that makes and sells geocells, and was one of the first non-exclusive licensees to the original geocell patent. A02101-A02103, A02683-A02700, A03916-A03917, A04217 (14-21). As another example, third party witness Chip Fuller worked for **Geo** Dynamics, which was another distributor of geosynthetic products including the GEOWEB geocell. A03929 (20-23), A03772-A03773.

Many magazines and trade shows cater to the geosynthetics industry. Such magazines include **Geo**-Strata magazine, **Geo**synthetics World magazine, **Geo**fabrics Journal, and **Geo**technical Fabrics Report (now known as **Geo**synthetics magazine). A03715 (9-12), A03996 (20-25), A04000 (3-9), A04050 (10). Some trade shows in the geosynthetics industry include **Geo**Americas, **Geo**-Frontiers, and Euro**Geo**5. A02167, A02169, A04011 (13-15).  Industry associations include the **Geo**synthetics Institute, the **Geo**synthetic Manufacturers Association, and the ASTM **Geo**synthetics Technical Committee.  A02074.

Appellee Presto has also registered several other trademarks beginning with the GEO- prefix for various geosynthetic products, including GEOSYSTEMS (U.S. Trademark Registration Nos. 1,444,150 and 3,787,780), GEOBLOCK (U.S.

Trademark Registration Nos. 1,335,543 and 3,787,779), GEOTERRA (U.S. Trademark Registration No. 3,628,394), GEOPAVE (U.S. Trademark Registration No. 3,722,991), GEORUNNER (U.S. Trademark Registration No. 2,774,697), GEOPATH (U.S. Trademark Registration No. 3,517,718), and GEOBIN (U.S. Trademark Registration No. 3,513,774). A00177, A00181, A00185, A00187, A00198, A00200, A00204, A00206, A02790-A02795.

Many third parties in the geosynthetics industry also identify their products with the GEO prefix. A03929 (4-14). For example, live U.S. trademarks in International Class 19 for geosynthetic goods registered based on use in commerce include GEOPLAST (U.S. Trademark Registration No. 3,883,696), GEOSTRONG (U.S. Trademark Registration No. 3,925,965), GEOTECH (U.S. Trademark Registration No. 3,632,633), GEOCOIR (U.S. Trademark Registration No. 1,732,090), and GEOLON (U.S. Trademark Registration No. 1,212,454), among others. A02494-A02503.

In addition, many parties in the geosynthetics industry have identified their webbing products using the **WEB** suffix. In fact, besides GEO**WEB**, Presto itself has also registered the AGRI**WEB** trademark (U.S. Trademark Registration No. 2,665,611) for an expandable webbing, i.e. geocell. A00210, A02088-A02100. Other live U.S. trademarks in International Class 19 for geosynthetic goods registered based on use in commerce include STRATA**WEB** (U.S. Trademark

13

Registration No. 4,102,960) and SORB**WEB** (U.S. Trademark Registration No. 3,014,800).[2] A00715-A00718, A02708-A02720.

Other geocells have also been offered in the United States. Terrafix offers the TERRA**WEB** geocell, which uses the Latin TERRA prefix instead of the Greek GEO prefix. A02172-A02175. The MIRA**WEB** product has been offered in the U.S. by at least two different suppliers. A02645-A02655, A02735-A02750. Tenax offers geocells in the U.S. using the TEN**WEB** mark. A03742-A03743, A02664-A02670. The MIRA**WEB** geocell and the TEN**WEB** geocell were commercially available as recently as 2006, as seen in a research study performed by the California Department of Transportation. A02615, A02645-A02655, A02735-A02750. This research study also included the ENVIROGRID geocell offered by Geo Products, and a TERRACELL product offered by Webtec. A02620.

Of critical importance, all of these WEB geocells, as well as the GEOWEB geocell offered by Presto, are made from high density polyethylene (HDPE), a specific type of polymer. A01014, A02588, A02637, A02645, A02664, A02671, A02736, A02755. As further discussed below, all of these HDPE geocells are

---

[2] The TTAB noted that although the SORBWEB registration was originally issued under § 44(e) of the Lanham Act, as of July 2011, a Section 8 affidavit had been accepted and a Section 15 affidavit had been acknowledged.

distinctly different from PRS's NEOWEB geocells made from NEOLOY® polymeric alloys.

## History of NEOWEB Development

PRS was incorporated in Israel in 1996. A04168-A04169. Beginning in October 1996, PRS entered into a licensing arrangement with Presto to make and sell geocells using the GEOWEB trademark outside of North America for a period of five years, i.e. through 2001. A02177. This business relationship between Presto and PRS was known to many people in the industry, including third party witness Chip Fuller. A03685 (17-21). In 2001, following litigation between the parties, PRS and Presto entered a settlement that extended the licensing agreement for another five years, i.e. through 2006. A02178. The new license arrangement did not prevent PRS from developing its own geocells or selling its own geocells under other brand names.

During its business relationship with Presto, PRS envisioned a geocell that could be used for demanding road base and ground support applications (e.g. highway and railway construction) in which heavy load capacity and durability were critical. Unfortunately, the HDPE from which the GEOWEB product and other competing geocells was made was not a suitable material because it deformed under heavy stress, and could perform adequately for only a few years. A04353-A0454. Other deficiencies with HDPE included low durability, large

thermal contraction, high intrinsic thermal coefficient, low stiffness, and loss of strength at high temperatures. A04552-A04553.  Consequently, PRS asked Presto to devote R&D funding to improving the composition of the geocells. Presto refused.  A04375-A04376, A02178.

PRS recognized the need to perform its own research and development to develop products that could be used in those demanding applications that could not be served by the outdated GEOWEB product. PRS thus began developing new polymeric alloys that could provide geocells with higher performance and durability, which became branded as PRS's NEOLOY® materials. A04344 (17-23), A04379 (7-16). PRS has been awarded many patents for these polymer alloys and for geocells incorporating them, including U.S. Patent Nos. 7,648,754; 7,674,516; 7,541,084; 7,501,174; 7,462,254; 7,993,080; 8,025,457; and 8,026,309. A00539, A00548, A00582, A00599, A00615, A02532, A02551, A02568.

In late 2005, PRS began designing its marketing campaign for its improved geocell product. A professional marketing firm, Consensus, was asked to brainstorm possible new brand names. Some other marketing firms also offered possible new brand names to PRS. A04380-A04381, A00264-A00271.

In deciding on the new brand name, PRS emphasized two points. First, the new brand name should promote the fact that PRS was selling a new, different, and innovative product. A04525-A04526.  Second, due to the previous business

relationship, PRS was aware of Presto's GEO family of trademarks, and wanted to avoid any confusion or association with Presto or other manufacturers that used the GEO prefix. A04462.  Thus, when considering a list of over 60 proposed marks, PRS immediately rejected those that began with Geo-, Terra-, or Ground-. PRS also rejected another suggested mark, Neo-Geo, for the same reason. A04384-A04385.  PRS eventually selected NEOWEB as the new trademark for its geocell products to be used along with its previous trademark NEOLOY® (U.S. Trademark Registration No. 3,653,070) for its novel polymeric alloys. The term NEO emphasized the new and different aspect of PRS' products, and distanced PRS from Presto's decaying GEOWEB brand. A04380, A04462-A04463, A04473.

After the business relationship with Presto ended, PRS immediately took steps to communicate its independence to the public.  For example, PRS tried to remove all uses of the term "Geoweb" on its website, which had previously been used to increase traffic from search engines. A02892-A02895. PRS also began using the phrase "formerly Geoweb" to make clear the fact that PRS no longer sold the GEOWEB product. A02186. Furthermore, PRS changed most of its distributors to target a different market.  A02839-A02840.

PRS began offering its initial generation of NEOWEB product to customers in 2007. This first-generation product was similar to, but different from, the standard HDPE used in the industry. In 2008, PRS began offering its second-

17

generation NEOWEB product to customers. The second-generation product was made from NEOLOY® polymeric alloys, which have vastly improved performance characteristics compared to HDPE, and all subsequent generations of NEOWEB products have been made from various blends of NEOLOY® polymeric alloys. A02176 (¶2), A02179 (¶10).

PRS's research and development efforts have been recognized by independent third parties. For example, Geosynthetics magazine is the most prestigious non-academic magazine in the geosynthetics industry. An article in the August 2009 issue of Geosynthetics magazine described the new development processes being used by PRS to improve its NEOWEB geocells. A04545-A04553. The editors of the magazine noted that this article specifically departed from the magazine's policy of not focusing on a specific product or company, because the editors wanted to provide an example of how new product development could be done effectively and encourage the industry to follow PRS's example. A04546. Accordingly, PRS's NEOWEB geocells are new and different from the standard HDPE geocells sold by all other manufacturers.

## SUMMARY OF THE ARGUMENT

The TTAB incorrectly held that the first *DuPont* factor, the similarity or dissimilarity of the marks as to appearance, sound, connotation, and commercial

impression, weighed in favor of likelihood of confusion. Because marketplace conditions were not considered, too much weight was given to the common –WEB suffix shared with many other marks in the marketplace. Greater weight should have been placed on the difference between the prefixes NEO- and GEO-, and on the fact that one letter can be sufficient to distinguish two marks, particularly when their overall meaning is considered.

The NEOWEB mark also has a different connotation and commercial impression (i.e. new and different web) from the GEOWEB trademarks (i.e. ground web). Specifically, the TTAB did not consider that the NEO- prefix includes the connotation of "different". This additional connotation also changes the commercial impression of the NEOWEB mark (i.e. not the same, but different from all other webs). Furthermore, evidence of advertisements was misinterpreted. Third party witness Chip Fuller also testified that consumers could and do distinguish between NEOWEB and GEOWEB. As a result, the two marks should have been found to be dissimilar, and this *DuPont* factor should have weighed against a likelihood of confusion.

The TTAB also incorrectly held under the fifth *DuPont* factor that the GEOWEB trademarks had a strength (i.e. scope) sufficient to reach the NEOWEB mark. The TTAB considered statements made by Presto that were not supported with evidence, and did not consider the weakness of the GEOWEB trademarks due

19

to its lack of conceptual strength and lack of evidence of marketplace strength. The GEO- prefix is widely used in the industry to refer to many product lines, and in many business and brand names.  The -WEB suffix is widely used to refer to webbing, and is also present in many brand names.  These third-party uses show that small differences are sufficient to distinguish marks from each other.  The GEOWEB trademarks are just more than descriptive, and thus entitled to only  a narrow scope of protection for geocells.  This reduced scope should have been considered in the final determination of likelihood of confusion.

Furthermore, the NEOWEB products are factually different from all other geocells, in that they are made from NEOLOY® polymeric alloys instead of just high density polyethylene (HDPE).  This difference also reflects on the "new and different" connotation of the NEOWEB mark.  This *DuPont* factor should have weighed against a likelihood of confusion.

The TTAB did not make a specific finding as to Presto's allegation of actual confusion.  Based on the evidence, the TTAB should have held that no actual confusion occurred.

The TTAB properly held that the GEOWEB trademarks were not famous. The TTAB also correctly held that purchasers of geocells were sophisticated and exercised a great deal of care.  These *DuPont* factors correctly weighed against a

likelihood of confusion. Finally, the TTAB correctly found that there was no bad faith in PRS's actions.

When the *DuPont* factors are correctly balanced, PRS's NEOWEB mark is not likely to be confused with the GEOWEB trademarks. This Court should so hold by reversing the TTAB's decision and dismissing the opposition.

## ARGUMENT

### I.   The Standard of Review

The ultimate determination of likelihood of confusion made by the Trademark Trial and Appeal Board ("TTAB") is an issue of law that is reviewed by this court *de novo*. *In re Viterra*, 671 F.3d 1358, 1361 (Fed. Cir. 2012). The factual findings of the TTAB are reviewed for substantial evidence. *Id.*

### II.   The NEOWEB and GEOWEB marks are different in appearance, sound, connotation, and commercial impression.

The first *DuPont* factor considers the similarity or dissimilarity of the marks as to appearance, sound, connotation, and commercial impression. The court can place more weight on a dominant portion of a mark, for example if another part of the mark is descriptive, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re Natl'l Data Corp.*, 753 F.2d 1056, 1058 (Fed.

Cir. 1985); *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565 (Fed. Cir. 1983) (greater weight should be given to the force and effect of the dominant portion of a mark); *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261 (Fed. Cir. 2002).

While not a rule, it is often the first word, prefix, or syllable of a mark that is most likely to be remembered by a purchaser. *Cf. Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369 (Fed. Cir. 2005) (VEUVE of VEUVE CLIQUOT mark found dominant because it was first word of the mark); *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874 (Fed. Cir. 1992) (CENTURY was dominant element of both marks which began with that term).

When comparing marks, the court consider the conditions in the marketplace under which prospective purchasers make their choices. *In re Nat'l Distillers and Chem. Corp.*, 297 F.2d 941, 944 (CCPA 1962); *Quaker Oats Co. v. General Mills, Inc.*, 134 F.2d 429 (7th Cir. 1943).

In considering the appearance of the marks, PRS and Presto both appear to agree that the two marks are likely to be perceived as two coalesced terms, GEO and WEB for Presto's trademarks, and NEO and WEB for PRS's applied-for mark. Trial Brief for Opposer, page 21. In the marketplace, many geocells are offered that have a –WEB suffix, such as STRATAWEB, AGRIWEB, SORBWEB,

MIRAWEB, and TENWEB.     A02708-A02720, A02084-A02087, A02645-A02655, A02735-A02750, A02664-A02670.  Presto itself sells its geocells under two marks with a –WEB suffix, AGRIWEB and GEOWEB.  The use of the WEB suffix in many different marks indicates that this suffix cannot by itself indicate origin in any one source.  *Long John Distilleries, Ltd. v. Sazerac*, 426 F.2d 1406 (CCPA 1970) (LONG JOHN v. FRIAR JOHN, no confusion where marks have common suffix but different commercial impression).

Because this –WEB suffix is common and will not serve to distinguish between various marks in the marketplace, the purchaser will pay attention to the other elements of the mark to distinguish the source of the goods/services.  In other words, the purchaser will focus on the prefixes, such as NEO-, STRATA-, SORB-, MIRA-, TEN-, GEO-, or AGRI-, to distinguish between the products and their sources.  *Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344 (Fed. Cir. 2011) (third-party usage of marks having common end phrase 'City Bank' suggests consumers are sensitive to differences in the first word of the mark; CAPITAL CITY BANK not likely to be confused with CITIBANK); *In re Natl Data Corp.*, *supra* (when a descriptive term is used in marks for related products, the purchasing public relies more on the non-descriptive portion of each mark to distinguish); *Claremont Polychemical Corp. v. Atlantic Powdered Metals, Inc.*, 470 F.2d 636 (CCPA 1972) (no confusion between EVERGOLD and

DURAGOLD; the prefixes EVER and DURA are different in sound and appearance, and both are descriptive of the goods).

PRS submits that when the purchaser focuses on the prefix, i.e. NEO- versus GEO-, the fact that the two marks are identical except for the first letter should assume less weight in relation to the connotation and commercial impression.

In contrast, the TTAB stated that the two marks were identical except for the first letter (**N**EOWEB versus **G**EOWEB).    A0040.    PRS submits that this reasoning does not consider the conditions in the marketplace because it places too much weight on the descriptive –WEB suffix, which is not unique to Presto's mark, and which is not used for distinguishing purposes by consumers.    The dominant NEO and GEO prefixes should be weighed more heavily in this analysis.

In addition, the TTAB's analysis does not consider whether a one-letter difference can be sufficient to distinguish the marks.    The Principal Register contains several examples of registered trademarks which recite identical goods and which differ by only the first letter.    These include SONY and PONY (tennis balls); and MEAD and SMEAD (hanging folders, binder covers, and report covers). A02480-A02483, A02476-A02479. These registrations show that a one-letter difference can be sufficient.    Their probative value lie in the fact that they issued, not in their use.

PRS notes that the letter N is visually different from the letter G, whether in uppercase or in lowercase.  This fact also reduces the likelihood that an imperfect recollection by a prospective purchaser will confuse the two marks, or the two different sources.

PRS also notes that of the twenty-six possible three-letter prefixes ending in –eo (i.e. AEO-, BEO-, CEO-, etc.), only GEO- and NEO- have any relevant connotation to the recited goods.  While the prefixes share some letters, they have clearly different connotations.  As a result, this similarity in appearance and sound should be discounted.

Next, in considering connotation, the TTAB correctly acknowledged that the GEO- prefix suggested the "earth", while the NEO- prefix had a different meaning, that of "new" or "revised".  A00041.  However, the TTAB did not recognize that the NEO- prefix also includes the connotation of "different".  This aspect of the NEO- prefix was specifically emphasized several times in the deposition of Oded Erez (page 231, 242, 324, 377).  PRS also requests that this Court take judicial notice that the NEO- prefix also includes the connotation of "different". This fact is reflected in two dictionary definitions from Webster's II New College Dictionary and The American Heritage College Dictionary.  A04586-A04591. This connotation of "different" also suggests to the purchaser that the source of the NEOWEB product is different from all other sources.

The TTAB also ignored applicable caselaw stating that differences in meaning for identical goods indicate a lack of likelihood of confusion. *Lever Brothers Co. v. Babson Bros. Co.*, 197 F.2d 531 (CCPA 1952) (no confusion between SURGE and SURF for detergent; different connotation); *Gulf States Paper Corp. v. Crown Zellerbach Corp.*, 471 F.2d 795 (CCPA 1969) (E-Z and CZ not confusing for same goods because E-Z suggests easy, while CZ suggests only initials); *Smith v. Tobacco By-Products & Chemical Corp.*, 243 F.2d 188 (CCPA 1957) (GREEN LEAF for plant sprays suggests the spray makes leaves green, opposer's mark BLACK LEAF suggests the opposite). The NEOWEB mark connotes a new and different webbing, i.e. NEOLOY® alloys versus standard HDPE. In contrast, the GEOWEB trademarks simply connote a webbing used in or with the ground or soil. These connotations are different, and do not overlap.

Finally, the TTAB incorrectly considered PRS's advertisements in determining the commercial impression of the marks. In its decision of September 27, 2013, the TTAB stated that the NEOWEB product was consistently touted as a later generation that improved upon the GEOWEB product. A00041. In the decision of February 14, 2014, the TTAB stated that PRS's efforts to show its credentials and industry experience "repeatedly resulted in advertisements that touted its *New* version of the *Geo*web products" (italics in original). A00050.

Respectfully, PRS submits that the TTAB's interpretation of "a new version of a GEOWEB product" would be more appropriate for a NEO-GEOWEB mark, not the present NEOWEB mark.

Furthermore, a review of PRS's advertisements shows that the TTAB's statements cannot be supported. Two different sets of PRS advertisements have been presented. The first set refer to NEOWEB products as being an advance over "the previous generation" of GEOWEB products. A00336-A00340. However, this statement only compares the new and different NEOWEB products to old GEOWEB products. Comparative advertising is a well-known practice, and is recognized by consumers. This statement cannot be reasonably interpreted as suggesting that NEOWEB products and GEOWEB products have the same source. The second set of advertisements use the phrase "NEOWEB (formerly GEOWEB)". A02928, A02931. The phrase "formerly" has been held to reduce likelihood of confusion between a new source and an old source. In *Kassbaum v. Steppenwolf Productions Inc.*, 236 F.3d 487 (9th Cir. 2000), the court stated that a former band member of Steppenwolf was entitled to refer to himself as "formerly of Steppenwolf" because this reduced likelihood of confusion as to the source of his new band's music, and the context of the historical reference to the old band Steppenwolf further reduced confusion between Steppenwolf and the new band. In other words, the word "formerly" made clear that the new music was not coming

27

from Steppenwolf.  In the same way, the phrase "formerly GEOWEB" clarifies that NEOWEB is not GEOWEB and does not have the same source as GEOWEB, and distances the marks from each other.  The TTAB's interpretation of the effect of PRS's advertisements on the commercial impressions of the respective marks is exactly opposite that of a prospective purchaser.

To summarize, when the conditions in the marketplace are correctly considered, the proper weighting of connotation and commercial impression, along with sight and sound, results in the NEOWEB and GEOWEB marks being found to be dissimilar.  As to appearance, the different first letter in each mark is part of the dominant element that purchasers will remember, since the common –WEB suffix is shared with many other products in the marketplace.  The NEOWEB mark connotes a new and different product, from a new and different source, and has a different connotation from the GEOWEB trademarks.  This difference reduces the likelihood of confusion.  PRS's advertisements consistently convey the message that the NEOWEB product is different from the GEOWEB product, as well.  The overall commercial impression of the two marks is different.  Third party Chip Fuller testified that buyers or potential buyers distinguish NEOWEB from GEOWEB.  A03760-A03761, A03762 (9-24).  Substantial evidence does not support the TTAB's factual finding on the first *DuPont* factor.

**III.    The GEOWEB trademarks have a narrow scope that does not**

**reach the NEOWEB mark.**

The fifth *DuPont* factor relates to the fame or strength of the registered trademark.    A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning).    *In re Chippendales USA Inc.*, 622 F.3d 1346, 1353-54 (Fed. Cir. 2010).    Fame can be measured indirectly from evidence such as the volume of sales, advertising expenditures, and the length of time those indicia of commercial awareness have been evident.    *Bose Corp. v. QSC Audio Prods.*, 293 F.3d 1367, 1371 (Fed Cir. 2002). The Federal Circuit has noted that "raw numbers alone in today's world may be misleading…Consequently, some context in which to place raw statistics is reasonable." *Bose Corp.*, 293 F.3d at 1375.

The GEOWEB trademarks are conceptually very weak, and are just slightly more than descriptive.    In this regard, PRS and Presto both agree that the word mark is likely to be perceived as two coalesced terms, GEO and WEB.    Presto even splits the word in its design mark by color in this manner, as seen below:



Both of these terms are conceptually weak, and so the overall GEOWEB trademark is also conceptually weak.

As noted by third party witness Chip Fuller, the GEO prefix is commonly used throughout the industry and is understood to refer to the earth or ground. A03796 (6-12).   For example, product lines in the industry include **geo**cells, **geo**grids, **geo**textiles, **geo**membranes, etc, which are referred to in Presto's own exhibits.   A03527, A03162, A04569. Industry magazine titles include **Geo**-Strata magazine, **Geo**synthetics World magazine, **Geo**fabrics Journal, and **Geo**synthetics magazine. A03996, A04000, A04050, A03715.   Industry trade shows include **Geo**Americas, **Geo**-Frontiers, and Euro**Geo**5. A02167, A02169, A04011.  Industry associations include the **Geo**synthetics Institute, the **Geo**synthetic Manufacturers Association, and the ASTM **Geo**synthetics Technical Committee. A02074.   The GEO prefix is also present in several third-party trademarks for geosynthetic products, such as GEOPLAST, GEOSTRONG, GEOTECH, GEOCOIR, and GEOLON.   A02494-A02503.   Thus, the GEO prefix should be considered conceptually weak.

The WEB suffix is also commonly used in the industry and recognized as having a specific meaning.   Several different manufacturers include the WEB suffix in the brand name for their HDPE geocell, including STRATAWEB, SORBWEB, TERRAWEB, MIRAWEB, and TENWEB.   A02708-A02720,

A00715-A00718, A02172-A02175, A02645-A02655, A02735-A02750, A02664-A02670, A03742-A03743.  All of these marks have been used in commerce in the United States during the time the GEOWEB trademarks have been registered.  For example, a research study by the California Department of Transportation compared the MIRAWEB, GEOWEB, and TENWEB geocells, along with two other HDPE geocells.  A02620.

The asserted GEOWEB trademarks also describe their goods as being "… ground support plastic webbing sheets.." and "… webbing for use in… ground and soil stabilization."  A00831, A00729.  The use of a term in the identification of goods shows that the term has descriptive significance as applied to the goods. *Institut Nat'l Des Appellations D'Origine v. Vinters Int'l Co.*, 958 F.2d 1574, 1580 (Fed. Cir. 1992) (holding that CHABLIS was a type of good, not a geographic term, due to its use in the description of goods).  Thus, the WEB suffix is conceptually weak.

As described above, there are many third-party registrations and uses that include the terms GEO or WEB.  These show that standing alone, GEO and WEB are each weak terms.  Because both GEO and WEB are conceptually very weak terms, the resulting coalesced GEOWEB trademark is also conceptually weak.  The TTAB erred in interpreting this argument as a collateral attack on the validity of the GEOWEB trademarks.  This argument was directed to the strength of the

31

trademarks, not their validity.    PRS recognizes that one of the GEOWEB trademarks is incontestable and thus cannot be challenged as being merely descriptive.    However, this does not mean the trademark has a wide scope. Instead, substantial evidence shows the GEOWEB trademark is conceptually weak.

As to the marketplace strength of the GEOWEB trademarks, Presto never provided any evidence of its sales.  Presto only later tried to assert on page 9 of its Trial Brief that worldwide sales of GEOWEB products exceeded ten million dollars over thirty years, without stating their U.S. sales.  Presto only provided advertisements using the GEOWEB trademarks from 1984 through 2010.  No context, such as market share or the number of prospective purchasers who viewed these advertisements, was provided.  These advertisements show only the length of time that Presto has advertised, not their effectiveness.  Indeed, third party witness Chip Fuller testified that "the majority of customers had never heard of a geocell or GEOWEB." A03756-A03757.    As a result, substantial evidence shows the GEOWEB trademark is not strong in the marketplace either.

Applicant submits that *The Wooster Brush Co., v. Prager Brush Co.*, 231 USPQ 316 (TTAB 1986) is particularly applicable to the present facts.  There, the TTAB noted that the scope of protection for "weak" marks has often been limited to the substantially identical notation and/or to the subsequent use and registration thereof for substantially similar goods. The addition of other matter to a highly

suggestive or descriptive designation can be sufficient to avoid confusion. The Board thus held that there was no confusion between POLY FLO for paint brushes and POLY GLO for paint applicators, where all three words were in common use in the field. The terms FLO and GLO had specifically different meanings and suggested specifically different qualities. There was only a one-letter difference between the two marks, and POLY, FLO, and GLO all had recognized meanings. Similarly, in the present case, there is only a one-letter difference between the two marks, and GEO and WEB both have recognized meanings. *Wooster Brush* indicates that a one-letter difference is sufficient to distinguish between marks for substantially similar goods when the registered mark is weak. *Cf. Clark Equip. Co. v. Baker-Lull Corp.*, 288 F.2d 926 (CCPA 1961) (YARDLOADER not confusingly similar to CARLOADER for forklifts because common portion LOADER describes the function of a forklift; YARDLOADER also not confusingly similar to YARDLIFT because common portion YARD suggests that forklift is useful in a yard); *Milwaukee Nut Co. v. Brewster Food Serv.*, 277 F.2d 190 (CCPA 1960) (in using words suggestive of the use of the merchandise, owner of BEER NUTS mark ran the risk of obtaining a smaller scope of protection than a purely arbitrary mark).

The TTAB erred in describing GEOWEB as "a well-established brand in this field sufficient to accord it a slightly wider scope of protection, despite any

possible conceptual weakness." PRS submits that the GEOWEB trademarks are only slightly more than descriptive. Their scope may cover an arbitrary JEOWEB mark that has a prefix with no connotation, but not the NEOWEB mark, which has a prefix with a recognized connotation and commercial impression. Third party witness Chip Fuller has testified that buyers or potential buyers distinguish NEOWEB from GEOWEB. A03760-A03761, A03762 (9-24). This affects the final determination of likelihood of confusion.

The TTAB correctly found that Presto failed to show that its GEOWEB trademarks were famous. Comparing Presto's claim of ten million dollars of sales over 30 years to prior cases decided by this Court confirms a lack of fame.[3] *Shen Manufacturing Co. v. Ritz Hotel Ltd.*, 393 F.3d 1238 (Fed. Cir. 2004) (RITZ mark was not famous despite more than $5 million annual sales, over 100 years of use, and annual advertising expenditures of hundreds of thousands of dollars); *Kimberly-Clark Corp. v. H. Douglas Enter., Ltd.*, 774 F.2d 1144 (Fed. Cir. 1985) (HUGGIES: over $300 million in sales over 9 years, $15 million in advertising in one year); *Specialty Brands Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 674-75 (Fed. Cir. 1984) (SPICE ISLANDS for teas, spices and seasonings: $25 million

---

[3] Again, there is no evidence in the record for Presto's claim of ten million dollars in worldwide sales.

annually in sales for spices, $12 million between 1959 and 1981 for tea, "several million" in advertising, in use for 40 years).

### IV.   Purchasers of geocells are sophisticated and exercise care.

The NEOWEB mark and the GEOWEB trademarks are applied to geocells. Geocells are purchased by well-educated, sophisticated people such as engineers, contractors, and distributors who work for engineering companies, construction firms, and site developers. A03698-A03700, A04361-A04362.

Geocells are typically used in high-value projects that require thousands of man-hours over months or years to finish, such as roads, retaining walls, and channels.  The company that completes a project usually makes certain guarantees and so takes on liability.  A02182-A02183, A04359-A04360. Thus, the purchaser of geocells is highly motivated to understand the product thoroughly before buying.

The purchasing process for geocells is generally slow.  Geocells of different manufacturers are customarily compared by their specifications, which contain technical information concerning mechanical and chemical properties. A03742 (8-23), A03760 (2-5), A03763 (10-17), A04360-A04361. Multiple communications between the buyer and seller may occur, and obtaining an order can take months or years.  A03789-A03790, A03792-A03793, A04178, A04362, A04364-A04366.

This long, careful process permits the purchaser to exercise a high degree of care and review.

Geocells are also very expensive. They can range in price from about $0.25 to $1.50 per square foot. A single truck load of geocells can cost $50,000 or more. Projects over $1 million are possible. A03785-A03786, A03789 (2-22), A04366-A04370.

There is always less likelihood of confusion where the goods are expensive and purchased after careful consideration. *Elec. Design & Sales Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713 (Fed. Cir. 1992). Third party witness Chip Fuller testified that buyers or potential buyers distinguish NEOWEB from GEOWEB. A03760-A03761, A03762 (9-24). The TTAB correctly found that this *DuPont* factor weighed against a likelihood of confusion.


**V.    The NEOWEB products are different.**

NEOWEB products are different from all other geocells in the marketplace. NEOWEB geocells are made from PRS's NEOLOY polymeric alloys, which have been patented. In contrast, all other geocells on the market, including those offered under the marks GEOWEB, MIRAWEB, TENWEB, ENVIROGRID, TERRACELL, STRATAWEB, and SORBWEB, are made from high density polyethylene (HDPE). A01014, A02568, A02637, A02645, A02664, A02671,

A02736, A02755.   The NEOLOY alloys have been proven to offer higher performance and durability compared to HDPE.  A01798-A01804.  This difference compared to all other geocells on the market is reflected in the "new and different" connotation of the NEOWEB mark.   This *DuPont* factor weighs against a likelihood of confusion.

## VI.    There is no actual confusion.

Presto alleged one instance of actual confusion via an email that allegedly came from Canada.  The TTAB decisions did not address this allegation, which goes to one of the *DuPont* factors.  PRS submits that no actual confusion occurred, and the email is inadmissible as hearsay.

The entirety of the email allegedly showing actual confusion follows:

> *We are a company which is doing well in the ground and*
> *infrastructure stabilization. We are familiar with Neoweb from*
> *PRS, and we assumed that the neoweb was the next generation*
> *Geocell, based on GEOWEB.*
> *Can you clearify this to me?*
> *-Is there a relation between PRS and Presto;*
> *-Difference between GEOWEB and Neoweb*

No actual confusion is present. Actual confusion would require the writer of the email to believe that NEOWEB geocells are produced by Presto, or that GEOWEB geocells are produced by PRS. However, the writer specifically states

that s/he understands that NEOWEB geocells are from PRS. The writer also correctly states that NEOWEB geocell is a "next generation" geocell compared to the GEOWEB geocell. Thus, the writer is not actually confused.

PRS believes the writer was simply asking whether PRS and Presto are related to each other. Since PRS and Presto previously had a business relationship, the writer's question is understandable. The writer also asks about the differences between GEOWEB and NEOWEB. This email shows no actual confusion.

This email is also inadmissible as hearsay. Presto's employee Patricia Stelter admitted that she edited the email, and the original was not produced. A02923 (¶25). This email contains no indicia of reliability, such as the writer's identity. This email is, at best, hearsay, and cannot be considered credible without direct testimony. *Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 761-62 (CCPA 1980) (where no direct testimony by third party was provided, court stated "Actual confusion is entitled to great weight but only if properly proven… such is not the case here."). No evidence of actual confusion exists.

## VII.    There is no bad faith.

Presto asserted that many actions taken by PRS showed a bad faith intent to trade on Presto's goodwill in its GEOWEB trademarks.   The TTAB correctly found that there was no evidence to find a bad faith intent to confuse.

Presto alleged that PRS hid the term "GEOWEB" in the background of its website.  Trial Brief for Opposer, page 19.  However, PRS and Presto previously had a business relationship during which no objection would have arisen.  Once the business relationship ended, PRS tried to remove all references to GEOWEB from its website, but failed. A02892-A02895. Presto located one usage of GEOWEB, which was immediately corrected upon notice.   A04137-A04138. The TTAB correctly found it was possible to make an innocent mistake among thousands of lines of source code.

Presto also alleged that PRS directly copied its marketing materials and compared itself to GEOWEB to trade on the goodwill of the GEOWEB trademarks.  Trial Brief for Opposer, page 19. However, Patricia Stelter, Presto's employee, admitted that some pictures in Presto's marketing brochures actually came from PRS during the time of their business relationship, and Oded Erez also testified as to Presto's use of PRS's photographs and literature. A04007 (8-17), A04295-A04299.  In other words, PRS was using its own pictures. Patricia Stelter also admitted that third parties produced much of the marketing material, and that Presto could not prove its ownership of the marketing materials. A04041 (22)-A04042 (10), A04043 (9-23), A04044 (23)-A04045 (7).   As to comparing NEOWEB to GEOWEB, this is standard comparative advertising.   The TTAB correctly found that the evidence was insufficient to find intent to confuse.

Presto also alleged that PRS had a commercial relationship with Google to promote NEOWEB products to consumers searching for Presto's GEOWEB products.  Trial Brief for Opposer, pages 19-20; A03606-A03610. The TTAB did not address this accusation, which is quickly rebutted.  Presto's allegation is based on the Featured Videos section returning a clip referring to PRS NEOWEB when a search for GEOWEB is performed.  A03606.  However, the explanation of "Featured Videos" explicitly states that such videos are not advertisements or paid placements. A03610.  In other words, Google placed the PRS Neoweb clip in the Featured Videos section, not PRS. Google's actions cannot be interpreted as PRS's intent.  Presto's allegation is false.

## CONCLUSION

Substantial evidence does not support the Trademark Trial and Appeal Board (TTAB)'s factual finding that the NEOWEB and GEOWEB marks are similar in appearance, sound, connotation, and commercial impression, so as to weigh in favor of likelihood of confusion.  The TTAB incorrectly ignored relevant differences in connotation, and misinterpreted PRS's advertisements.  Rather, the overall impression of the NEOWEB mark on geocells is that it is new and different from all other geocells.  Third party Chip Fuller testified that buyers or potential

buyers distinguish NEOWEB from GEOWEB.  NEOWEB is thus not likely to be confused with GEOWEB.

In addition, substantial evidence does not exist to support the TTAB's finding that the GEOWEB trademarks have a large scope.  The combination of two very weak terms, GEO and WEB, results in a weak mark.  Insufficient evidence was provided to show the marketplace strength of GEOWEB.  The scope of the GEOWEB trademarks is insufficient to reach the NEOWEB mark.

The TTAB correctly held that the GEOWEB trademarks are not famous; that the purchasers of geocells are sophisticated and exercise care; that no actual confusion existed, and that there was no bad faith intent to confuse by PRS.

The TTAB should have held that there was no actual confusion between the NEOWEB and GEOWEB marks.  The difference in the meaning of the NEO- and GEO- prefixes results in a lack of likelihood of confusion.

When the *DuPont* factors are correctly balanced, there is no likelihood of confusion between the NEOWEB mark and the GEOWEB trademarks.

For these reasons, PRS moves this Court to reverse the decision of the TTAB sustaining the opposition, and to permit NEOWEB to move to registration.

Respectfully submitted,

July 21, 2014                        /s/ Richard M. Klein
                                    Richard M. Klein
                                    FAY SHARPE LLP
                                    The Halle Building, 5th Floor
                                    1228 Euclid Avenue
                                    Cleveland, Ohio 44115
                                    Telephone: 216-363-9000
                                    Facsimile: 216-363-9001

                                    Attorney for Applicant-Appellant
                                    P.R.S. Mediterranean Ltd.

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed: September 27, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

─────

Trademark Trial and Appeal Board

─────

*Reynolds Consumer Products, Inc.*

*v.*

*PRS Mediterranean Ltd.*

─────

Opposition No. 91189669
against Serial No. 77248825

─────

James H. Donoian, Sarah Marks, Heidi Garfield and Daniel J. Navarro,
    of Greenberg Traurig LLP for Reynolds Consumer Products, Inc.

Richard M. Klein and George P. Huang of Fay Sharpe LLP,
    for PRS Mediterranean Ltd.

─────

Before Bucher, Kuhlke and Shaw,
    Administrative Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

PRS Mediterranean Ltd. (hereinafter "applicant" or "PRS") seeks registration on

the Principal Register of the mark **NEOWEB** (*in standard characters*) for the

following goods:

> nonmetallic building materials, namely, three-dimensional
> polymeric cells, cellular confinement systems, and expandable
> plastic webbing sheets all for road base and for ground support
> used for construction of roads and for prevention of ground

erosion; plastic articles for reinforcing geotechnical-reinforced materials for use in building and construction; materials, namely, sand, gravel, crushed stone, graded aggregate, recycled asphalt, crushed concrete, native soil, fly ash, quarry waste in the nature of fine crushed stone, earth, soil and concrete, earth and soil for use in road building and civil engineering construction; polymeric webbing, and sheets constructed from plastic, all for road base and ground support, for building roads and for civil engineering construction and for the prevention of erosion of roads and the like structures; pavements and pavement materials, namely, sand, gravel, ballast, recycled concrete, recycled asphalt, crushed stone, quarry waste in the nature of fine crushed stone, earth, soil and concrete" in international class 19.[1]

Reynolds Consumer Products, Inc., doing business as Presto Products Company (hereinafter "opposer" or "Reynolds/Presto"), opposed registration of applicant's mark, asserting as its ground for opposition, that registration of applicant's **NEOWEB** mark in connection with goods legally identical to opposer's own cellular confinement systems would lead to a likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d) based upon its **GEOWEB** trademarks (hereinafter the "GEOWEB marks") previously used and registered by Reynolds/Presto:

| **GEOWEB** | for "road base and ground support plastic webbing sheets for building roads and preventing erosion of roads" in International Class 19;[2] |
|---|---|
|  | for "construction materials, namely, plastic erosion control and protection blocks, sheets, mats and webbing for use in constructing roadways, airstrips, driveways, railroads, trailways, parking lots, floors, patios, paddocks, boat ramps, greenhouse |

[1] Application Serial No. 77248825 was filed on August 7, 2007. The application includes a statement of a *bona fide* intention to use the mark in commerce, and a claim of priority, pursuant to Section 44(d) of the Trademark Act, 15 U.S.C. § 1126(d), based upon Israeli application number 197823 filed on February 12, 2007.

[2] Registration No. 1351682 issued on July 30, 1985; renewed.

| | shelving, hillsides, ramps, and dam spillways, and for ground and soil stabilization, erosion prevention, and turf protection" in International Class 19.[3] |
| --- | --- |

Consistent with the extensive testimony and exhibits made part of this record, throughout this opinion we will refer to opposer's involved Class 19 products as identified above as simply a cellular confinement system or opposer's "**GEOWEB** products."

Opposer also alleges that its famous **GEOWEB** marks are likely to be diluted by registration of applicant's **NEOWEB** mark under the Trademark Dilution Revision Act of 2006 ("TDRA"), Trademark Act Section 43(c), 15 U.S.C. § 1125(c).

## I.    Evidentiary Issues

Before proceeding to the merits of the opposition, we note that the evidentiary record in this case is relatively large, and each party has interposed evidentiary objections pursuant to the Federal Rules and TTAB precedent. *See Harjo v. Pro-Football Inc.,* 45 USPQ2d 1789, 1792 (TTAB 1998); and *Marshall Field & Co. v. Mrs. Fields Cookies,* 25 USPQ2d 1321, 1326 (TTAB 1992). Many of the parties' objections relate to admissibility (e.g., hearsay, "late-produced" documents), while others relate to relevance and probative value (*e.g.,* witness bias).

---

[3] Registration No. 3699433 issued on October 20, 2009, from its pleaded U.S. Application Serial No. 77202954. *Hunt Control Systems Inc. v. Koninklijke Philips Electronics N.V.*, 98 USPQ2d 1558, 1563 n.6 (TTAB 2011) (an applicant is on notice that an opposer intends to rely on a registration that matured from a pleaded application); *UMG Recordings Inc. v. O'Rourke,* 92 USPQ2d 1042, 1045 n.12 (TTAB 2009); and *Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 USPQ2d 1917, 1920 (TTAB 2006).

3

<u>Patents</u>

Reynolds/Presto objects to extensive testimony and documentation related to allegations of use (or misuse) of its patents in the years after 2006, and applicant's patents that were filed with the United States Patent and Trademark Office around 2007. Opposer's objections have to do with relevance,[4] PRS' cross-examination of opposer's witness allegedly exceeding the scope of the direct examination,[5] etc. While we find no reason to strike the testimony and evidence about the role of patents, patent markings and an aggressive use of all forms of intellectual property rights claimed by each party in the marketplace skirmishes between these competitors, we also find no probative evidence supporting allegations that Reynolds/Presto made improper threats of patent infringement against PRS customers and distributors based upon expired patents. In general, we find little relevance in the detailed inclusion of applicant's various patents on this record other than further demonstration of applicant's intensive research and development efforts, which fact we acknowledge.

<u>Opposer's three arguably late Notices of Reliance</u>

Due to difficulties opposer experienced in filing several of its Notices of Reliance using the Board's electronic filing system known as ESTTA, we review the complicated histories surrounding three of these filings.

---

[4] *See* Stelter Dep. of Dec. 1, 2011, 90 TTABVUE at 105-114, and 92 TTABVUE at 135-36, PRS Ex. 8 GEO-785-76,

[5] Stelter Dep., 90 TTABVUE at 109-110.

Opposer's trial period closed on December 16, 2011. Applicant alleges that among three late Notices of Reliance we should exclude from the record is opposer's Fifth Notice of Reliance entitled "Notice of Reliance on Agreements and Related Correspondence between Opposer and Applicant." This is a confidential entry of agreements between the parties of 1996 (22 pages), 1999 (nine page letter with three pages of exhibits) and 2001 (five page letter and two pages of exhibits), correctly filed and served via ESTTA on December 12, 2011.[6] Accordingly, these documents and exhibits are clearly of record in this proceeding.

Opposer's Seventh Notice of Reliance was entitled "Notice of Reliance on printed publications." This notice was prepared by counsel on December 15, 2011, filed via First-class mail with a Certificate of Mailing on December 15, 2011, allegedly also served upon applicant by First-class mail on December 15, 2011, and received by the United States Patent and Trademark Office on December 21, 2011. However, upon receipt at the TTAB, these 133 pages of documents were stored electronically behind the 27 pages of confidential information remaining in 48 TTABVUE at 4-30.[7] For this reason, opposer was unsure at the time it filed its main brief in this proceeding that the documents were indeed part of the record. When this problem

---

[6] 40 TTABVUE at 5-45, NEO-00268 to NEO-00308: 1996 agreement (NEO-00268 to NEO-00289); 1999 letter (NEO-00290 to NEO-00298); 1999 exhibits (NEO-00299 to NEO-00301); 2001 letter (NEO-00302 to NEO-00306); and 2001 exhibits (NEO-00307 to NEO-00308). Opposer received tracking number ESTTA445757 as confirmation.

[7] 99 TTABVUE at 6-138, printed publications; GEO-026-27, GEO-033-35, GEO-039-41, GEO-044-45, GEO-051-53, GEO-058-60, GEO-064-67, GEO-070-71, GEO-076-77, GEO-080-83, GEO-087-89, GEO-094-97, GEO-100-02, GEO-109-11, GEO-119-25, GEO-130-31, GEO-133-35, GEO-140-43, GEO-155-61, GEO-165-70, GEO-175, GEO-193-95, GEO-460-61, GEO-853-56 and GEO-965-96.

came to the attention of the Office, these pages were rescanned into the record in November 2012 as entry #99. Inasmuch as this original Notice of Reliance was filed with a Certificate of Mailing on December 15, 2011, and opposer's trial period ended on December 16, 2011, these documents are clearly of record in this proceeding. 37 CFR § 2.195(c), 37 CFR § 2.197(a), and TBMP § 110.01(c).

Much like opposer's Fourth Notice of Reliance on applicant's marketing materials, it appears that opposer's Sixth Notice of Reliance entitled "Notice of Reliance on Discovery Interrogatories and Requests for Admission" was prepared by counsel on December 12, 2011, and these documents, according to the signature of Millie Badillo, were allegedly also served upon applicant by First-class mail on December 12, 2011. Although Ms. Badillo signed on that date a certification of service on applicant, there is no certification of filing with the United States Patent and Trademark Office. Nonetheless, Nycol Morrisey, senior trial paralegal for opposer's counsel, signed a declaration in November 2012 that on December 13, 2011, she had "filed [these documents] using … ESTTA … [but that they are] not currently appearing on the TTABVUE system for this proceeding." She did not reference an ESTTA tracking number or attach a printout of an on-screen acknowledgement, an e-mail filing receipt, or a certification of mailing to support this statement.[8] Unlike opposer's first three notices of reliance sent days earlier via ESTTA by opposer's counsel, opposer has provided no ESTTA tracking number as confirmation. TBMP § 109. And unlike the case in the Fourth Notice of Reliance,

---

[8] Without such confirmation a party may not assume that a notice has been successfully filed.

6

there is no indication that a duplicate copy of applicant's discovery responses was subsequently filed (as opposed to merely served on opposing counsel) via First-class mail with Certificate of Mailing and no evidence at all that this Notice of Reliance was ever filed with the Board during opposer's testimony period in December 2011. Under 37 CFR 2.120(j) and 37 CFR 2.122(e), Notices of Reliance are required to be filed with the Board during the testimony period of the offering party. As noted in the Board's Order of December 14, 2011, opposer's testimony period closed on December 16, 2011, and opposer's rebuttal period closed on March 30, 2012. Presumably opposer discovered this deficiency at a point where it could no longer be cured. This Notice of Reliance was filed on November 16, 2012, which is well outside of opposer's testimony period. Hence, we have given no consideration to opposer's untimely filed notice of reliance on discovery interrogatories and requests for admission.[9]

<u>Probative value of portions of Oded Erez's trial testimony</u>

Opposer objects to multiple portions of the trial deposition testimony of Oded Erez, conducted on February 2, 2012 ("Erez Dep.") on a variety of grounds, which

---

[9] See 100 TTABVUE at 2-8. Opposer states that a Board "docketing clerk also informed Opposer that the Board did not have a copy of Opposer's Notice of Reliance on Discovery [and] that if the Notice of Reliance on Discovery had been properly submitted to the Board during the testimony period but was not currently displayed on the docket, opposer could submit an affidavit describing the submission and re-file the Notice of Reliance on Discovery." Opp. Reb. Br. at 2. As discussed above, opposer has not established that this Notice of Reliance "had been properly submitted" by "describing the submission" with the statement that opposer "filed" this Notice – given the absence of documentary evidence to support the affidavit, either a tracking number confirmation from ESTTA or a certificate of mailing, in stark contrast to the supporting ESTTA tracking number for some of opposer's other Notices of Reliance. We hasten to add that consideration of these documents would not have changed the result herein.

include relevance,[10] hearsay,[11] lack of foundation and speculation.[12] Mr. Erez founded PRS in 1996, spent many years as its CEO and continues as chairman of the PRS Board of Directors. He has an impressive array of academic credentials. He has worked as an Israeli consular official stationed in the United States (in the field of international trade), as a senior consultant on behalf of the United Nations to developing countries, and as an international business person at the highest levels of several multinational corporations. For more than a decade, he maintained a significant and close-working relationship with Reynolds/Presto.

It goes without saying that Mr. Erez is biased in favor of PRS in this litigation. However, his testimony is not characterized by contradictions or inconsistencies. The fact that, as applicant's Chairman of the Board his testimony may be biased, merely goes to the weight or probative value of the testimony. For example, we find his unsubstantiated suggestions of bribes and corruption on the part of Reynolds/Presto in connection with tender offers in Florida and Hawaii to be irrelevant and of no probative value absent corroborating evidence.[13] Some of his discussions of applicant's communications with Strata, or of third-party uses of "Geo"- or "-Web-" formatives by others in the geosynthetics industry, for example, seem to reflect dated and third-hand oral information he claimed to have heard that

---

[10] *See, e.g.*, Erez Dep. 75 TTABVUE at 86-87, 96-100, 102-103, 108-121; applicant's Not. of Rel. on Patents, filed February 14, 2012, 50 TTABVUE at 5-131, NEO 001159-001285.

[11] 77 TTABVUE at 94-95, 161-65.

[12] 75 TTABVUE at 63-64, 67, 109-11, 135-36; 77 TTABVUE at 74, 101-02, 146-50, 154-57, 161-69.

[13] 77 TTABVUE at 68-75.

8

has little to no support elsewhere in the record. We have not considered these examples of hearsay for the truth of the matter stated. On yet the other hand, we find his testimony regarding applicant's commercial and research activities such as PRS' commitment to innovation, scholarship and excellence to be probative. Hence, we have carefully accorded to the various portions of his testimony the probative value each portion merits.

<u>Other objections</u>

Similarly, to the extent we have relied on specific material against which either party has lodged an objection, we will explain our reasoning below. Other than those specifically discussed above, we see no need to discuss the other objections separately, as none of them is outcome determinative. Rather, we have considered the entire record in making our decision, keeping in mind the parties' various objections, and have consistently accorded whatever probative value the subject testimony and evidence merit.

## II.   The Record

Opposer's Notices of Reliance:
1.   Opposer's First Notice of Reliance on opposer's GEOWEB registrations;[14]
2.   Opposer's Second Notice of Reliance on records from trademark registrations, applications, and proceedings in foreign jurisdictions;[15]

---

[14] 39 TTABVUE at 5-11, Registration Nos. 1351682 and 3699433; filed via ESTTA on December 12, 2011, and allegedly served upon applicant by first class mail on November 30, 2011 (having a heading within the Certificate of Service dated December 12, 2011). Opposer received tracking number ESTTA445754 as confirmation.

[15] 41 TTABVUE at 5-27, GEO-942 to GEO-964; documents from Lithuania, Latvia, Estonia, Mexico, India, Portugal, Slovenia, Turkey, Sweden, Austria and South Africa;

9

3. Opposer's Third Notice of Reliance on Internet materials;[16]
4. Opposer's Notice of Reliance on the discovery deposition and exhibits taken from Strata Systems' witness Chip Fuller, as taken on April 21, 2011 ("Fuller Dep.");[17]
5. Opposer's Fourth Notice of Reliance on applicant's marketing materials;[18]
6. As discussed above, Opposer's Fifth Notice of Reliance was entitled "Notice of Reliance on Agreements and Related Correspondence Between Opposer and Applicant" was correctly filed and served via ESTTA on December 12, 2011;[19]
7. As discussed above, opposer's Seventh Notice of Reliance on printed publications are clearly of record in this proceeding;[20]
8. Opposer's Notice of Reliance on Testimony from a

---

filed via ESTTA on December 12, 2011, and allegedly served upon applicant by first class mail on November 30, 2011. Opposer received tracking number ESTTA445760 as confirmation.

[16] 44 TTABVUE at 4-11, GEO-000993 to GEO-000994; copies of source data and screenshots from applicant's website http://www.prs-med.com/en-US/Content.aspx?Page=earth_retention as accessed on November 12, 2010. Opposer received tracking number ESTTA446568 as confirmation.

[17] 45 TTABVUE at 4-177, the transcript of Mr. Fuller's deposition, and opposer's attached exhibits B, C, D, E, I, M and N are deemed "Confidential"; the unredacted, public portions are located at 46 TTABVUE at 4-120, and include opposer's exhibits A, F, G, H, J, K and L, and applicant's exhibit 2; the documents of both entries were filed via First-class mail with Certificate of Mailing on December 15, 2011, Allegedly also served upon applicant by First-class mail on December 15, 2011, and received by the United States Patent and Trademark Office on December 21, 2011. This discovery deposition and exhibits were submitted pursuant to a stipulation of the parties to have this admitted as trial testimony (*See* 35 TTABVUE at 2).

[18] 47 TTABVUE at 4-163; includes NEO-00383 to NEO-00394, and NEO-00400 to NEO-00534, and NEO-00536 to NEO-00551; notice was prepared by counsel on December 12, 2011. Evidently, Nycol Morrisey, senior trial paralegal for opposer's counsel, attempted unsuccessfully to file these documents via ESTTA on December 13, 2011. A duplicate copy of these documents were subsequently filed via First-class mail with Certificate of Mailing on December 15, 2011, allegedly also served upon applicant by First-class mail on December 15, 2011, and received by the United States Patent and Trademark Office on December 21, 2011.

[19] 40 TTABVUE at 5-45, (see discussion at footnote 6, *supra*).

[20] 99 TTABVUE at 6-138 (see discussion at footnote 7, *supra*).

10

    Canadian Trademark Proceeding,[21] pursuant to an earlier stipulation of the parties,[22] having affidavits of Oded Erez, Gary Bach and Patricia Stelter;[23]

9.   Opposer's Eighth and Rebuttal Notice of Reliance on Printed Publications and Third Party Trademark Registrations and File Histories;[24] and

Opposer's testimony:

1.   Trial Deposition of Manuel Almonte, Jr., taken on December 14, 2011, and exhibits annexed thereto ("Almonte Dep.");[25]

2.   Trial Deposition of Gary Bach, taken on December 1, 2011, and exhibits annexed thereto ("Bach Dep.");[26] and

3.   Trial Deposition of Patricia Stelter, dated December 1, 2011, and exhibits annexed thereto ("Stelter Dep.")[27]

Applicant's Notices of Reliance:

1.   Applicant's Notice of Reliance on patents;[28]

2.   Applicant's Notice of Reliance on one trademark file history from Canada[29] and three trademark files from the United States;[30]

---

[21] Docket Entry # 80 TTABVUE indicating opposer's intentions to rely on such affidavits, etc. March 21, 2012.

[22] 60 TTABVUE, dated March 5, 2012.

[23] NEO002845 to NEO003071 and NEO003491 to NEO003641.

[24] 83 TTABVUE at 4-61, GEO-0995 to GEO-1052.

[25] 86 TTABVUE at 4-87; Presto Exhibits ## 61 and 62.

[26] 88 TTABVUE at 4-86 (redacted version); 89 TTABVUE at 4-140 (Confidential with Presto Exhibits ## 1-3).

[27] 90 TTABVUE at 4-194 (redacted version with Presto Exhibits ## 4-11 (GEO-00214 to GEO-00229 and GEO-00274 to GEO-00323); 91 TTABVUE at 4-190, Presto Exhibits ## 12-55 (GEO-00230-37, GEO-00242-61, GEO-00266-273, GEO-00324-33, GEO-00348-89, GEO-00404-08, GEO-00430-31, GEO-00460-61, GEO-00500-45, GEO-00787 to GEO-00800, GEO-00803-16, GEO-00818-20, GEO-00822, GEO-00824, GEO-00826, GEO-00828, GEO-00830, GEO-00832, and GEO-00916-923); 92 TTABVUE at 4-58, Presto Exhibit #56 (GEO00026 to GEO00125); 92 TTABVUE at 60-138, PRS Exhibits ## 1-10 (NEO-001725-27; GEO-00001-35, GEO-00061-83, GEO-00327-39, GEO-00548, GEO-00785-87, and GEO-00812).

[28] 50 TTABVUE at 5-213, PRS Patents Nos. 7462254, 7501174, 7541084, 7648754, 7674516, 7842373, 7993080, 8025457 and 8026309 (NEO-001157 to NEO-001285, NEO-003211-66) and Presto Patents Nos. 4778309, 4797026 and 4965097 (NEO-003185- NEO-003210).

[29] 51 TTABVUE at 5-34 (NEO-00552-81).

3. Applicant's Notice of Reliance on trademark registrations;[31]

4. Applicant's Notice of Reliance on printed publications;[32]

5. Applicant's Notice of Reliance on testimony from another proceeding,[33] pursuant to an earlier stipulation of the parties,[34] having affidavits of Oded Erez and Patricia Stelter,[35] and pursuant to another stipulation of the parties,[36] the discovery deposition and exhibits of Strata Systems' witness, Chip Fuller, taken on April 21, 2011;[37]

6. Applicant's Notice of Reliance on certain confidential materials;[38] and

Applicant's testimony:

The Trial Deposition of Oded Erez, taken on February 2, 2012, and exhibits annexed thereto ("Erez Dep.").[39]



[30] 51 TTABVUE at 35-271, opposer's Reg. Nos. 1351682 (GEOWEB) and 3699433, and applicant's Reg. No. 3653070 (NEOLOY) (NEO-001396 to NEO-001632).

[31] 54 TTABVUE at 4-190 (NEO-000102-03, NEO-000212-48, NEO-003464-90, NEO-001370-83, NEO-003072 to NEO-003174, and NEO-003356-59.

[32] 55 TTABVUE at 7-321 (NEO-000249-57, NEO-000582-90, NEO-001286 to NEO-001395, and NEO-001725 to NEO-001925); 56 TTABVUE at 2-398 (NEO-001926 to NEO-002751-NEO-002322); 57 TTABVUE at 1-331 (NEO-002323 to NEO-002653); and 58 TTABVUE at 2-341 (NEO-002654-96, NEO-002748 to NEO-002844, and NEO-003175 to NEO-003461).

[33] Docket Entry # 79 TTABVUE indicating applicant intentions to rely on such affidavits, etc. March 20, 2012.

[34] 60 TTABVUE, dated March 5, 2012.

[35] NEO-002845 to NEO-003071 and NEO-003491 to NEO-003641.

[36] 35 TTABVUE at 2, ¶1.

[37] 45 and 46 TTABVUE, see footnote 16, *supra*.

[38] 49 TTABVUE 5-70 (NEO-00268 to NEO-0308 and NEO-000327-51).

[39] 61 TTABVUE at 5-204 (redacted version of first portion of Mr. Erez's testimony); 62 TTABVUE at 5-195 (redacted version of second portion of Mr. Erez's testimony); 63 TTABVUE at 5-34, non-confidential PRS Exhibits ## 8, 11-13 (GEO-785-86, NEO-001287-98, NEO-002925-32, NEO-003194 to NEO-003201); 64 TTABVUE at 5-64, PRS Exhibits ## 14-18, 21-22 (NEO-002770-72, NEO-002841-44, NEO-003361-62, NEO-003414-17, NEO-003430-57, and NEO-003462); 65 TTABVUE at 4-80, PRS Exhibits ## 23-27 (NEO-001301-24, NEO-001734-41, NEO-003267-77, NEO-003387 to NEO-003413, and NEO-003418-23);

## III.    The Parties

The parties to this action are international competitors within the geosynthetics industry. Geosynthetic products are polymeric materials used to reinforce the earth or soil. Specifically, the goal is to offer solutions to challenging engineering problems, including porous pavement, load support, slope protection and earth retention. Among the many different types of geosynthetic products that have been introduced over the past three decades, the type of geosynthetic product of greatest interest to us in this case is what is known as cellular confinement systems, or geocells.[40] A geocell is a three-dimensional honeycombed cellular structure formed from plastic strips that are welded together at intervals in an offset manner to form "webbing." This permits the structure to be collapsed during shipping, and then expanded into the cellular structure. When the cells are filled

---

66 TTABVUE at 5-77, PRS Exhibits ## 28-34 (NEO-00458-78, NEO-001725-33, NEO-001745-50, NEO-001939-53, NEO-002751-63, and NEO-003380-86; 67 TTABVUE at 5-123, PRS Exhibits ## 35-37, and 42-44, 46-48 (NEO-00383-94, NEO-00445-57, NEO-002739-46, NEO-003278 to NEO-003358, and NEO-003458-61; 68 TTABVUE at 5-51, PRS Exhibits #44-d&e (NEO-002394 to NEO-002440); 69 TTABVUE at 5-43, PRS Exhibits #44-f (NEO-002441-79); 70 TTABVUE at 5-77, PRS Exhibits #44-n-q (NEO-002624-96); 71 TTABVUE at 5-64, PRS Exhibits #44-a-c (NEO-002334-93); 72 TTABVUE at 5-71, PRS Exhibits #44-g-i (NEO-002480 to NEO-002546); 73 TTABVUE at 5-81, PRS Exhibits #44-j-m (NEO-002547 to NEO-002623); 74 TTABVUE at 5-180, PRS Exhibit 45. In comparing the Bates numbers for applicant's patents in this Entry #74 with the same patents in Entry #50, we find two confusing numbering systems:

| Patent No. | Bates in #74 | Bates in #50 | Patent No. | Bates in #74 | Bates in #50 |
|---|---|---|---|---|---|
| 7,501,174 | NEO-000168-0201 | NEO-001168-1201 | 7,541,084 | NEO-000132-0149 | NEO-001202-1218 |
| 7,648,754 | NEO-000116-0131 | NEO-001219-1234 | 7,674,516 | NEO-000150-0167 | NEO-001235-1251 |

76 TTABVUE at 5-65, Confidential PRS Exhibits ## 19, 20, and 38-41 (NEOS-000632-35, NEO-003463, and NEO-00327-382); and 77 TTABVUE at 5-195 (confidential version of Mr. Erez's testimony).

40 Erez Dep., 61 TTABVUE at 36.

13

with soil, earth, or related material and then compacted, the material is confined and becomes very stiff and strong.

By the late-seventies and early-eighties, Reynolds/Presto (through its predecessors-in-interest) had gained experience with environmentally-friendly construction products, and one of opposer's employees, an engineer named Gary Bach, was directly involved with the U.S. Army Corps of Engineers in the invention and development of an entirely new product line, namely an expandable grid for stabilizing an undersurface – a new product line that came to be known as a cellular confinement system, or simply geocells.[41] Opposer's geocells were manufactured from a high density polyethylene (HDPE) material. Ground reinforcement is achieved by in-filling the cells with local compacted materials, cement, etc. Given this history, perhaps not surprisingly, Reynolds/Presto was the first non-exclusive licensee of the '026 patent for these geocells.

For more than three decades, Reynolds/Presto has continued to be a prominent player in the field of geosynthetics – manufacturing construction products that offer solutions to challenging engineering problems, including porous pavement, load support, slope protection and earth retention. Since the mid-1980s, Reynolds/Presto has continuously marketed, distributed and sold its **GEOWEB** cellular confinement products under its **GEOWEB** marks throughout the United States and worldwide.[42] As seen above, opposer has obtained U.S. Trademark Registration Nos. 1351682

---

[41] U.S. Patent No. 4797026 ("the '026 patent") was filed by the United States of America (as represented by the Secretary of the Army) in 1986. 50 TTABVUE at 141-148 (NEO-003194 to NEO-003201).

[42] 88 TTABVUE at 57-58.

and 3699433 for the **GEOWEB** marks, and both registrations are valid and subsisting. Over the decades, opposer has invested substantial amounts of time, money and effort in to the development, advertisement and promotion of its **GEOWEB** products, and has expended considerable resources to protect the strength, goodwill and value of its **GEOWEB** marks.

PRS was incorporated in Israel in 1996.[43] Applicant is the alter ego of Mr. Oded Erez, its founder/Chairman/former CEO, etc. In October 1996, PRS entered into a licensing arrangement with Reynolds/Presto to use its **GEOWEB** trademarks in conjunction with the manufacturing, distribution and sale of **GEOWEB** products. PRS was permitted by license to distribute **GEOWEB** products in certain international markets in Europe, the Middle East and Africa.

Then in 2001, following litigation between the parties, Reynolds/Presto and PRS entered into a settlement agreement that extended the licensing agreement for another five years, whereby Reynolds/Presto agreed to allow PRS continued use of its **GEOWEB** marks. At some point while PRS was still a trademark licensee of Reynolds/Presto's **GEOWEB** marks, PRS made the decision to market and sell its own cellular confinement systems. In 2006, Reynolds/Presto terminated its contractual relationship with PRS.

Erez is an entrepreneur and inventor who has pushed his company to invest heavily in R&D, innovation, marketing, etc. According to his testimony, from early-on in his relationship with opposer's predecessor, Erez was frustrated, and

---

[43] Erez Dep., 61 TTABVUE at 23-26.

ultimately his efforts proved unsuccessful in getting Presto's high-level management to invest in making the original 1980s version of temporary geocells stronger and more durable. In spite of opposer's involvement with the invention of this entire product in conjunction with the Army Corps of Engineers (in the 70s and 80s), Erez alleges that Presto was complacent – willing to blend in with all the other "also-rans" who joined this field in recent decades. Mr. Erez and PRS committed to years of aggressive research and development activities. Accordingly, almost immediately after its licensing arrangement with Reynolds/Presto ended (2006), PRS had positioned itself to begin offering its initial generation of **NEOWEB** product (2007) to customers – HDPE geocells that were quite similar to the **GEOWEB** product it had earlier been manufacturing and selling. This placed PRS in direct competition with Reynolds/Presto's **GEOWEB** products. Then in 2008, PRS began offering its second-generation **NEOWEB** geocells (made out of NEOLOY polymeric alloys) to customers, claiming that this product had vastly improved performance characteristics compared to geocells made of HDPE. All subsequent generations of **NEOWEB** products have been made from various blends of NEOLOY polymeric alloys.

## IV.    Summary of the position taken by PRS

Applicant argues that during its business relationship with Opposer, PRS envisioned a geocell that could be used for demanding road base and ground support applications (e.g. highway and railway construction) in which heavy load capacity and durability were critical. Mr. Erez contends that the HDPE from which Reynolds/Presto's **GEOWEB** product was initially designed as a temporary measure,

and the HDPE was not a suitable material for more permanent and demanding applications because it deformed under heavy stress.[44]    These issues have been recognized in a relevant trade publication:

> … [W]ithout improvements, HDPE geomembranes are not suitable for long term applications. Problems of durability related to leaching of additives, oxidation, and to UV exposed facing should be addressed. Large thermal contraction and expansion of outer cells due to daily and seasonal temperature changes combined with high intrinsic thermal coefficient of the geocell material could lead to progressive failure initiating at the outer cells. Stress cracking of exposed facing could occur in low temperature. Low stiffness and strength may lead to significant creep having poor long-term dimensional stability.

> Considering the objectives of this research, PRS-Mediterranean received guidelines for developing the new polymeric alloy, Neoloy®, and thus improve its Neoweb® system, facilitating its use in retention systems. It also obtained design tools enabling utilization of the Neoweb® in demanding applications considering long-term performance.[45]

According to Mr. Erez, PRS notified Reynolds/Presto of these deficiencies, and urged opposer to devote R&D funding to improving the composition of its geocells, but opposer's top management was unwilling to invest the resources necessary to

---

[44] Erez Dep., 62 TTABVUE at 7-14.

[45] "Research and innovation: Seismic performance of various geocell earth-retention systems," http://geosyntheticsmagazine.com/articles/0809_f5_seismic.html, 55 TTABVUE at 24, by Dov Leshchinsky. This is an example where applicant has gotten a positive write-up in a specialty magazine in the geosynthetics field. We note that although applicant characterizes its "intensive research and development efforts" as having been recognized by "*independent*" third parties, the record reveals a very close relationship between Prof. Dov Leshchinsky and applicant's Oded Erez. The record repeatedly suggests overlapping webs of professional affiliation and financial support among Erez, his co-inventors, professors at the Transportation Research Institute of the University of Kansas, and other professionals who have worked extensively in this narrow field – with evidence of generous financial support from PRS and hands-on technical advice from Mr. Erez. We also note that this excerpt from a printed publication may not be taken for the truth of the matter asserted. On the other hand, the article does assist in a general sense of understanding applicant's product, and this piece of basic information has not been objected to by opposer.

stay on the cutting edge of innovative geosynthetic materials.[46] The 2001 agreement did not prevent PRS from developing its own geocells or selling its own geocells under other brand names. When Mr. Erez decided that Reynolds/Presto's "outdated" **GEOWEB** product was unable to meet the more demanding applications he envisioned, Erez testified that PRS began investing heavily (many years and millions of dollars) in order to develop new manufacturing processes to produce superior polymeric alloys for improved geocells having higher performance and durability.[47] According to one report, these included initially superior HDPE blends and later novel polymeric alloys, having a lower thermal expansion coefficient and higher tensile stiffness and strength compared to HDPE.[48] These polymeric alloys later became known as PRS' NEOLOY[49] materials. PRS' ongoing research and development efforts have been recognized with utility patents for these polymer alloys and for geocells incorporating them – many filed with the United States Patent and Trademark Office.[50] Mr. Erez is the inventor on at least nine patents (filed around 2007) for NEOLOY material and **NEOWEB** geocell products.

---

[46] Erez Dep., 62 TTABVUE at 29-33.

[47] Erez Dep., 61 TTABVUE at 199-200; 62 TTABVUE at 8-11, 34.

[48] "UNPAVED ROADS: Tough cell," http://www.roadsbridges.com/unpaved-roads-tough-cell, 58 TTABVUE 338 at 341, 67 TTABVUE 108 at 109. This research was funded, *inter alia*, by the Transportation Research Institute of the University of Kansas and applicant, and depended upon "great cooperation, guidance, support and/or assistance from the following individuals: Prof. Dov Leshchinsky, Prof. Robert Parsons, Prof. Mustaque Hossain, Prof. David White, Dr. Robert Honea, Mr. Oded Erez, Mr. Izhar Halahmi and Dr. Ofer Keif.

[49] Registration No. 3653070 issued to PRS on July 14, 2009.

[50] 74 TTABVUE at 3 – 180. Oded Erez listed as an inventor or all of them, and most also include the name of Izhar Halahmi,

As early as 2005, PRS began designing its marketing campaign for its improved geocell product. After collecting dozens of possible brand names from professional marketing firms and internal management committee brainstorming sessions, Mr. Erez decided to select the name "**NEOWEB**"[51] because the prefix "neo," meaning "new," emphasizes the novel, innovative aspect of PRS' products, and so this mark "is shouting new, different, something that was not known before. Better polymeric material, better this and everything is new!"[52] Mr. Erez said he specifically wanted to avoid any confusion or association with opposer or other manufacturers using the GEO prefix.[53] After applicant and opposer terminated their business relationship in 2006, PRS says it immediately took steps to proceed with only appropriate and limited use of the **GEOWEB** trademark. While applicant had for years used the mark "Geoweb" on its website, Erez claims they subsequently tried to remove all uses of the term "Geoweb" from the website, and when they were later informed of a potential remaining use, this use was immediately corrected. Further, any mention of opposer's mark in applicant's promotional materials was to make it clear that PRS had credentials and experience in the industry, and that PRS' first generation geocell products (HDPE **NEOWEB**) meet the minimum specifications of competing HDPE products in the marketplace, including the **GEOWEB** products. However, Mr. Erez points out that it used the phrase "formerly Geoweb" in the materials to stress that PRS' prior business relationship with opposer no longer existed. Rather, Erez argues

---

[51] Erez Dep., 62 TTABVUE at 34-46.; and PRS Exhibits ## 38 & 39, 76 TTABVUE at 10-17 (confidential).

[52] Erez Dep., 62 TTABVUE at 46.

[53] Erez Dep., 62 TTABVUE at 114-128.

that PRS takes every opportunity in oral presentations and in written materials to claim the superiority of the **NEOWEB** products over HDPE products such as **GEOWEB** geocells.

## V.     Summary of the position taken by Reynolds/Presto

Reynolds/Presto argues that when PRS made a decision to adopt its **NEOWEB** trademark for use in conjunction with its cellular confinement products, PRS decided merely to alter Reynolds/Presto **GEOWEB** marks by a single letter. Opposer argues that without a doubt applicant intended to trade on the goodwill, expertise and reputation associated with opposer's **GEOWEB** prior marks. Reynolds/Presto points to applicant's marketing materials that refer to its **NEOWEB** products as "the next generation of," "identical to," and "formerly" the **GEOWEB** products. According to opposer, applicant trumpets its **NEOWEB** products as the "new" **GEOWEB** products. As proof of PRS' illicit use of Reynolds/Presto's **GEOWEB** mark, opposer points to white-on-white uses in recent years of **GEOWEB** in metadata to draw search engine traffic to PRS' website.

## VI.     Evidence of "Geo-" prefix by opposer and by third parties

Applicant placed into the record copies of opposer's other "Geo-" formative marks, as follows:

| | |
|---|---|
| **GEOBLOCK** | for "plastic road base and ground support blocks for building roads and preventing erosion of roads" in Int. Class 19;[54] |
| **GEOSYSTEMS** | for "construction materials, namely plastic blocks, sheets and webbing for use in construction of roadways, airstrips, |

[54] Registration No. 1335543 issued on May 14, 1985; renewed.

| | |
|---|---|
| | driveways, railroads, trailways, parking lots, floors, patios, paddocks, boat ramps, riverbank and shore stabilization, bridge abutment stabilization, ditch stabilization, greenhouse shelving, landscaping, hillside erosion control, building foundation stabilization, ramp construction, dam spillways, riverbank slope protection and revetment and dam systems across rivers" in International Class 19;[55] |
| **GEORUNNER** | for "construction materials, namely, plastic blocks, plastic erosion control and protection mats for access walks, turf, sand, and all terrain vehicle trails; plastic playground tiles; and plastic construction supports for plantings and secondary, less structural materials" in Int. Class 19;[56] |
| **GEOBIN** | for "composting containers made of plastic" in Int. Class 20;[57] |
| **GEOPATH** | for "construction materials, namely, plastic erosion control and protection blocks, sheets, mats and webbing for ground and soil stabilization, erosion prevention and turf protection" in International Class 19;[58] |
| **GEOTERRA** | for "construction materials, namely, plastic erosion control and protection mats for road construction, ground stabilization and erosion prevention" in Int. Class 19;[59] |
| **GEOPAVE** | for "construction materials, namely, plastic erosion control and protection blocks, sheets, and mats for use in constructing roadways, airstrips, driveways, railroads, railways, parking lots, floors, patios, paddocks, boat ramps, greenhouse shelving, hillsides, ramps, and dam spillways, and for ground and soil stabilization, erosion prevention, and turf protection" in International Class 19;[60] |
|  | for "construction materials, namely, plastic erosion control and protection blocks, sheets, mats and webbing for use in constructing roadways, airstrips, driveways, railroads, trailways, parking lots, floors, patios, paddocks, boat ramps, greenhouse shelving, hillsides, ramps, and dam spillways, and for ground and soil stabilization, erosion prevention, and turf protection" in International Class 19;[61] |

[55] Registration No. 1444150 issued on June 23, 1987; renewed.

[56] Registration No. 2774697 issued on October 21, 2003; Section 8 affidavit accepted and Section 15 affidavit acknowledged.

[57] Registration No. 3513774 issued on October 7, 2008.

[58] Registration No. 3517718 issued on October 14, 2008.

[59] Registration No. 3628394 issued on May 26, 2009.

[60] Registration No. 3722991 issued on December 8, 2009.

[61] Registration No. 3787779 issued on May 11, 2010.

|  | for "construction materials, namely, plastic erosion control and protection blocks, sheets, mats and webbing for use in constructing roadways, airstrips, driveways, railroads, trailways, parking lots, floors, patios, paddocks, boat ramps, greenhouse shelving, hillsides, ramps, and dam spillways, and for ground and soil stabilization, erosion prevention, and turf protection" in International Class 19;[62] |
| --- | --- |

Applicant argues from the record that opposer consistently highlights the "GEO-" prefix (for example, with the same shade of blue) in order to separate it from the suffix of each mark within this family of marks:



[63]

As seen above, the record is replete with descriptions of product lines from the geosynthetics industry, such as geocells, geogrids, geotextiles, geomembranes, etc. Industry magazine titles include *Geo-Strata* magazine, *Geosynthetics World* magazine, *Geofabrics Journal*, and *Geosynthetics* magazine. Industry trade shows include GeoAmericas, Geo-Frontiers, and EuroGeo5. Industry associations include the Geosynthetics Institute (GSI), the Geosynthetic Materials Association (GMA), and the ASTM Geosynthetics Technical Committee D35. It is also used in the trade names of others in the field:

---

[62] Registration No. 3787780 issued on May 11, 2010.

[63] http://www.prestogeo.com/, 55 TTABVUE at 121-22 (NEO-001725-26).



Although none of the following appears to cover cellular confinement systems, applicant placed into the record copies of the following five third-party registrations (owned by four different entities) having "Geo-" formative marks, as follows:[66]

| **GEOLON** | for "erosion control fabrics-namely, textile fabrics used for soil filtration and stabilization" in International Class 19;[67] |
|---|---|
| **GEOCOIR** | for "open mesh fabrics for preventing soil erosion" in International Class 19;[68] |
| **GEOTECH** | for "erosion control matting, meshes and blankets for stabilizing soil and vegetation" in International Class 19;[69] |
| **GEOPLAST** | for "building materials not of metal, namely, materials for ceilings and floors; building panels not of metal, namely, floor panels, ceiling panels; facings not of metal for building; frameworks not of metal for building; reinforcing materials not of metals for building; surfacing not of metal for building, namely, non-metal roofing, non-metal flooring; tiles not of metal for building; non-metal formworks for foundations; non-metal formworks for ventilated foundations; plastic formwork for columns; stay-in-place plastic formworks for floors, walls, ceilings, slabs; stay-in-place plastic formworks for columns; modular plastic formworks for floors, ceilings and slabs; non-metal formworks for slabs; non-metal modular elements for drainage basins, namely, plastic conduit for drainage; poured |

---

[64] http://www.geoproducts.org/, 58 TTABVUE at 202-09, 242-259 (NEO-003316-23, NEO-003362-79).

[65] http://www.hanesgeo.com/category.asp?csid=126, 58 TTABVUE 310-13 (NEO-003430-33).

[66] We note that Registration Nos. 3787588 and 3903151 are owned by the same party, and as registrations under Section 66(a) of the Trademark Act, 15 U.S.C. § 1141f(a), they are based upon an International Registration, not use in commerce, as was also the case with Registration No. 3418613.

[67] Registration No. 1212454 issued on October 12, 1982; renewed.

[68] Registration No. 1732090 issued on November 10, 1992; second renewal.

[69] Registration No. 3632633 issued on June 2, 2009.

|  | concrete tanks; non-metal grid for drivable lawns, namely, non-metal lattices; non-metal pre-vegetated system for roof gardens composed of modular elements made of thermoformed plastic suited to contain a layer of soil and plants; plastic tiles for sport surfaces; non-metal grid for water-permeable flooring for areas dedicated to hoofed animals, namely, non-metal lattices" in International Class 19;[70] |
| **GEOSTRONG** | for "building materials, namely, erosion control matting, meshes and blankets for stabilizing soil and vegetation" in International Class 19;[71] |

## VII.   Evidence of "-web-" formatives by third parties

In addition to the well-documented uses of opposer's **GEOWEB** and **AGRIWEB** marks, and applicant's **NEOWEB** mark, applicant produced for the record evidence of third-party uses of product trademarks in the field of cellular confinement systems having "-web-" formatives (mostly suffixes) in the trademarks, trade names, etc.:[72]



73   74

---

[70] Registration No. 3883696 issued on November 30, 2010.

[71] Registration No. 3925965 issued on March 1, 2011. We note that this registration is owned by Pave Tech, the owner of the **GEOTECH** mark applicant listed above.

[72] We have given no consideration to the following third-party properties referenced by applicant: Application Serial No. 77770180 [**DIAMONDWEB**] abandoned October 2011; Registration No. 0924065 [**AEROWEB**] expired 2002; and Registration No. 1443188 [**PARAWEB**] cancelled December 1993.

[73] http://www.dx2.net/1~dx2main.html and http://www.sitesupply.info/miraweb.htm, 58 TTABVUE at 210-20, 294-309 (NEO-003324-34, NEO-003414-29). Applicant also produced an expired registration for the mark **MIRAWEB** for cellular confinement systems (Registration No. 2582787) cancelled under Section 8 of the Act in 2009, to which we have given no consideration.



---

[74] http://www.fiberweb.com/, http://www.typargeotextiles.com/ and
http://www.geosynthetica.net/ 55 TTABVUE at 110-113 (NEO-001385-88); and
http://www.typargeotextiles.com/, Typar Geosynthetics from Fiberweb, 58 TTABVUE at 62-
63, 74, 135 (NEO-002764-65, NEO-002776, NEO-002837).

[75] http://www.terrafixgeo.com/assets/pdf/terraweb.pdf , 58 TTABVUE at 142 (NEO-002844).
terrafix Geosynthetics Inc. is a leading distributor and manufacturer of geosynthetic
products headquartered in Toronto, Canada.

[76] http://www.tenaxus.com/en/geosynthetics/products/geocell-tenweb.htm , 55 TTABVUE at
61 (NEO-001322), and 58 TTABVUE at 153-63, 229-35 (NEO-003267-77, NEO-003343-49).

[77] The SorbWeb™ Plus system is a geocomposite material designed for the containment of
hydrocarbons. www.sorbwebplus.com, 58 TTABVUE at 45-48 (NEO-002747-50). Applicant
also submitted a copy of Registration No. 3014800 [**SorbWeb**] issued to a Canadian company
under Section 44(e) of the Act on November 15, 2005. However, as of July 2011, the Section
8 affidavit was accepted and the Section 15 affidavit was acknowledged.

[78] 55 TTABVUE at 109 (NEO-001384), and 58 TTABVUE at 314-37 (NEO-003434-57).

[79] http://www.geogrid.com/products-upper-left-menu-93/strata-web-introduction.html as
accessed by applicant on January 31, 2012, 58 TTABVUE at 267 (NEO-003387). Although
applicant referenced an application abandoned in 1992 for the mark **STRATAWEB** for
plastic geosynthetic products (Application No. 74127614), Application Serial No. 85089482
issued on February 21, 2012, as Registration No. 4102960 [**StrataWeb**] for "geotextiles for
use in load support, slope and channel erosion protection and earth stabilization and

## VIII.    Standing and Priority

Opposer's two pleaded registrations for its **GEOWEB** marks have been made of record, they are clearly owned by opposer, and are in full force and effect. Because opposer has made these pleaded registrations properly of record, opposer has established its standing to oppose registration of applicant's mark and its priority is not in issue. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). In addition to its pleaded registrations, the record demonstrates widespread common law usage of the **GEOWEB** marks in connection with cellular confinement systems from a date that long precedes any date that applicant can claim for adoption and use of its **NEOWEB** mark. In fact, applicant does not dispute opposer's priority.

## IX.    Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of the probative facts in evidence that are relevant to the factors bearing on a likelihood of confusion. *See In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973); *see also Palm Bay Imp., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); and *In re Dixie Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). In considering the evidence of record on these factors, we keep in mind that "[t]he

---

retention" in International Class 19. *See also* 58 TTABVUE at 236-240, 267-293 (NEO-003350-55, NEO-003387-NEO-003413).

fundamental inquiry mandated by Section 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976); *see also In re Azteca Rest. Enters., Inc.,* 50 USPQ2d 1209 (TTAB 1999).

### A.    *Relationship of the Goods/Trade Channels/Class of Customers*

We first turn our attention to an evaluation of the relationship of the goods described in the application and registrations. It is apparent that the parties to this litigation were contractual partners as licensor/licensee with a decade of common history, before becoming competitors. Although applicant repeatedly points out the superiority of its products, for our purposes, we consider the involved goods herein to be legally identical. This is true in comparing the goods as identified in the pleaded registrations and the involved application, and as we understand both opposer's and applicant's respective common law uses.

Considering the channels of trade and classes of purchasers, because the goods are identical and there are no limitations as to channels of trade or classes of purchasers in either the application or opposer's registration, we must presume that applicant's and opposer's goods will be sold in the same channels of trade and will be bought by the same classes of purchasers. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012). *See also Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002); *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987); *Genesco Inc. v.*

27

*Martz*, 66 USPQ2d 1260, 1268 (TTAB 2003) and *In re Smith and Mehaffey*, 31 USPQ2d 1531 (TTAB 1994). Moreover, the record shows that applicant and opposer are competitors for the same customers and contracts, and their respective goods do indeed move through the same channels of trade to the same classes of customers. Accordingly, these several *du Pont* factors strongly favor a finding of likelihood of confusion.

### B.    Renown of opposer's GEOWEB marks

The record shows that opposer was most likely the first company to offer commercially cellular confinement systems, and continues to be a prominent player in this industry after more than thirty years. Based on this entire record, there is no question but that opposer's **GEOWEB** marks have served as distinctive source indicators for its cellular confinement products for more than three decades. Given the confidential nature of the parties' respective financial data, we cannot discuss specific sales figures. However, in evaluating this critical *du Pont* factor, we find no clear context for the numbers and nothing about the parties' respective market shares in recent years. Accordingly, we find that opposer has failed to make a persuasive case that its **GEOWEB** marks have achieved the level of renown required when one compares the evidence in this record with the plaintiff's showings in a variety of precedential cases dealing with fame. *See Shen Manufacturing* Co. v. *Ritz Hotel Ltd.,* 393 F.3d 1238, 73 USPQ2d 1350 (Fed. Cir. 2004); *General Mills v. Health Valley Foods,* 24 USPQ2d 1270 (TTAB 1992); *Kimberly-Clark Corp. v. H. Douglas Enter., Ltd.,* 774 F.2d 1144, 227 USPQ 541 (Fed.

Cir. 1985); and *Specialty Brands Inc. v. Coffee Bean Distribs., Inc.,* 748 F.2d 669, 674-75, 223 USPQ 1281, 1284 (Fed. Cir. 1984). Renown and strength are measured in degrees, and while this evidence falls short of demonstrating fame sufficient to play a "dominant" role in the process of balancing the *du Pont* factors, it does confirm **GEOWEB** as a well-established brand in this field sufficient to accord it a slightly wider scope of protection, despite any possible conceptual weakness.

### C.    *Inherent strength of the GEOWEB marks in the cited registrations*

The sixth *du Pont* factor requires consideration of any evidence pertaining to "the number and nature of similar marks in use on similar goods." Applicant has shown that both components of the literal portion of opposer's marks – the "GEO-" prefix and the "-WEB" suffix – are used by third-party competitors within this field. However, no third party has been shown to have adopted or used a mark as similar to opposer's marks (*i.e.*, having the combination of these terms) as is applicant's applied-for mark. Furthermore, absent a counterclaim to cancel these registrations, applicant cannot collaterally attack the validity of these registrations. Whatever arguable weaknesses may have been inherent in opposer's selection in 1984 of the term "Geoweb" for geocells in the form of plastic "webbing," under Section 7 of the Lanham Act, and in keeping with more than thirty years of usage in this field, we accord the pleaded marks the scope of protection to which they are rightly entitled.

29

### D.    The Marks

Applicant has applied to register the mark **NEOWEB**. The registered mark is **GEOWEB**. In comparing the marks, we must consider the marks in their entireties as to appearance, sound, connotation and commercial impression, to determine the similarity or dissimilarity between them. *Palm Bay,* 73 USPQ2d at 1692. The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. Because the similarity or dissimilarity of the marks is determined based on the marks in their entireties, the analysis cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on the entire marks, not just part of the marks. *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). On the other hand, different features may be analyzed to determine whether the marks are similar. *Price Candy Company v. Gold Medal Candy Corporation,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955). In fact, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re National Data Corp.*, 224 USPQ at 751.

As to appearance, these two marks are identical except for the first letter (**GEOWEB** versus **NEOWEB**). They are also strikingly similar in sound. As to

connotation, the prefix "Geo-" has the suggestion of "earth," while "Neo-" has a different meaning, often that of "new" or "revised." While applicant suggests that this distinction should be the end of this inquiry, we agree with opposer that prospective customers might well view "Neo-" as an intentional play on the word "Geo" – the more so inasmuch as applicant consistently touts its **NEOWEB** product as a later generation of products that improves significantly upon **GEOWEB** products. This combination of identical pronunciations and structure, and an almost intuitive connection to the earlier product is significant in this case, works to create a close association between the overall commercial impressions of the two marks used in a marketplace of legally identical, competing products. Thus, we find the marks to very similar in appearance, sound, connotation and commercial impression, and this *du Pont* factor weighs in favor of finding a likelihood of confusion.

### E.   *Sophistication of customer/expense/care in purchasing decisions*

The engineering challenges involving porous pavement, load support, slope protection and earth retention are necessarily enormous jobs. Hence, a single project is incredibly expensive given the total volume of cellular confinement materials and the required commitment of construction labor. Therefore, we have no doubt but that these products, as used in specific projects, involve expensive applications. The purchasers will inevitably involve engineers who should know in detail the specifications of complex products. A contract between a geosynthetics manufacturer like Reynolds/Presto or PRS, and an organization like CalTrans, for

31

example, will be entered into after much deliberation.[80] Hence, we find that care will be exercised on the part of sophisticated purchasers. This *du Pont* factor weighs in favor of a finding of no likelihood of confusion.

### F.     Accusation by both parties of the other's bad faith

Inasmuch as both parties have spent a great deal of time and money during this litigation trying to impugn the motivations and behaviors of each other, we feel compelled to discuss briefly such accusations.

With regard to the alleged bad faith by opposer, we note that the only relevance such actions would have relates to a possible defense of unclean hands, which was not pleaded by applicant. Moreover, we also find that the record does not establish actions amounting to unclean hands. As noted earlier, Mr. Erez accuses opposer of threatening to sue a number of applicant's potential distributors for infringing an expired patent that had been owned by the U.S. Army. The record contains confidential documents and testimony that Reynolds/Presto personnel may well have been aggressive in using opposer's trademarks, patents, copyrights, etc., in defending its share of the international market from its new competitor beginning in 2007. It seems possible that at least one potential U.S. distributor may well have backed out of preliminary discussions with PRS based upon calls from at least one of opposer's principals. However, we cannot be sure this goes beyond the rough-and-tumble of fierce competitors having a duty to protect their intellectual property rights. Certainly there is no proof in this record that opposer committed any

---

[80] 58 TTABVUE at 197.

wrongdoing with its product markings or by issuing verbal threats of patent infringement based upon an expired patent.

During his testimony in this proceeding, Mr. Erez points to requests for proposals from various U.S. municipalities or agencies that specified **GEOWEB** by its exact product specifications, if not its brand name. He goes so far as to accuse opposer of possible bribes and corruption in the way these specific transactions were handled. Again, the record contains no proof that opposer committed any wrongdoing in its dealings with these specific projects in Florida and Hawaii.

Opposer's accusations of applicant's bad faith or intent to confuse fall under the thirteenth *du Pont* factor. *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1442 (TTAB 2012). Specifically, opposer points to a single example in recent years of applicant's website having a white-on-white usage of **GEOWEB** in its metatags to help draw search traffic to its website.[81] Upon notice, applicant corrected it immediately, and given the years of partnership between these parties, it is certainly within the realm of possibility that it was an innocent mistake hidden within thousands of lines of source codes.

In addition, opposer cites to a pattern among applicant's written materials (in black-on-white) where it alleges applicant was clearly trying to trade on the good will of opposer's **GEOWEB** trademark. Indeed, applicant repeatedly touts its ten years of experience in the industry – manufacturing, selling and distributing

---

[81] Almonte dep., 86 TTABVUE at 21-47; Exhibits 61 and 62.

opposer's branded **GEOWEB** products internationally. While opposer treats these as evidence of malevolence, we disagree.

When applicant began to market its own new geocell products, it is not surprising that it would lead with ten-years of manufacturing expertise in the field, and as a way of showing its *bona fides* as a source of cellular confinement systems. Applicant argues that wherever the word **GEOWEB** appears in its ads, applicant immediately proceeds to tout the alleged improvements in its "new"/"NEO-" products as a significant differentiating factor from opposer's "outdated" product that it formerly manufactured and distributed as Presto's licensee. While some of applicant's marketing materials may raise an eyebrow, this is not sufficient to support a finding of intent to confuse. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 92 USPQ2d 1769, 1782 (2d Cir. 2009).

### G.    Conclusion: Balancing the Likelihood of Confusion factors

The goods, the channels of trade and classes of consumers herein are identical. Even if one concedes some inherent conceptual weakness in the trademark when opposer first adopted its mark in 1984, it has nonetheless become a widely-known and established brand, and the parties' marks involved herein are quite similar in appearance, sound and overall commercial impression. These factors, going in favor of a finding of likelihood of confusion, outweigh that which goes in applicant's favor, namely the care with which these goods will be purchased by fairly sophisticated professionals, and hence, we find that confusion is likely between opposer's **GEOWEB** marks and applicant's **NEOWEB** mark. To the extent we retain any doubt

as to whether there is a likelihood of confusion, we resolve such doubt, as we must, in favor of opposer, the prior registrant. *In re Shell Oil Co.,* 992 F.2d 1204, 26 USPQ2d 1687, 1691 (Fed. Cir. 1993).

## X. Dilution

Having found for opposer on likelihood of confusion, we find it unnecessary to analyze in depth the alternative issue of dilution. However, fame for dilution purposes requires an even more stringent showing than fame for likelihood of confusion purposes. Hence, where opposer has failed to demonstrate fame for purposes of likelihood of confusion, *ipso facto*, there is certainly an inadequate showing of fame for purposes of dilution.

*Decision:* The opposition herein is sustained on the basis of likelihood of confusion, and the registration of applicant's mark is hereby denied.

> This Opinion is not a
> Precedent of the TTAB

Mailed: February 14, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Reynolds Consumer Products, Inc.*

*v.*

*PRS Mediterranean Ltd.*
_____

Opposition No. 91189669
against Serial No. 77248825
_____

on Request for Reconsideration
_____

James H. Donoian, Sarah Marks, Heidi Garfield and Daniel J. Navarro,
of Greenberg Traurig LLP for Reynolds Consumer Products, Inc.

Richard M. Klein and George P. Huang of Fay Sharpe LLP,
for PRS Mediterranean Ltd.
_____

Before Bucher, Kuhlke and Shaw,
Administrative Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

The Board, in a final decision dated September 27, 2013, sustained the opposition

on the basis of likelihood of confusion brought by Reynolds Consumer Products, Inc.,

doing business as Presto Products Company (hereinafter "opposer"), to the mark

**NEOWEB** (*in standard character format*) as filed by PRS Mediterranean Ltd. (hereinafter "applicant") for cellular confinement systems.

On October 28, 2013, applicant filed a timely request for reconsideration (*see* Trademark Rule 2.129(c), 37 C.F.R. § 2.129(c)), based upon applicant's assertion that the Board erred in applying the first *du Pont* factor, and in failing to consider certain third-party trademark registrations, and that these errors led to our incorrectly holding that the **NEOWEB** mark is likely to be confused with the **GEOWEB** mark under Section 2(d) of the Lanham Act. Applicant requests, therefore, that the Board reconsider its decision and dismiss the opposition.

Opposer, on November 18, 2013, timely submitted its opposition to applicant's request for reconsideration, arguing that the Board's decision of September 27, 2013, was proper and that applicant's request should be denied.

In its motion for reconsideration, respondent asserts that our decision is in error for the following reasons:

1. The Board erred when considering the appearance and sound of the respective marks.

2. The Board erred when considering connotations and commercial impressions of the respective marks.

3. The Board erred in not considering certain third-party trademark registrations.

The premise underlying a request for rehearing, reconsideration, or modification of a decision under Trademark Rule 2.129(c) is that, based upon the evidence of record and the prevailing authorities, the Board erred in reaching the decision it issued. *See* TBMP § 543 (June 2013) and the authorities cited therein.

The request may not be used to introduce additional evidence, nor should it be devoted simply to a re-argument of the points presented in the requesting party's brief on the case. *See Amoco Oil Co. v. Amerco, Inc.*, 201 USPQ 126 (TTAB 1978). Rather, the request normally should be limited to a demonstration that based upon the evidence properly of record and the applicable law, the Board's ruling is in error and requires appropriate change. *See Steiger Tractor Inc. v. Steiner Corp.*, 221 USPQ 165 (TTAB 1984), *different results reached on reh'g*, 3 USPQ2d 1708 (TTAB 1984); *cf. In re Kroger Co.*, 177 USPQ 715, 717 (TTAB 1973). Although much of respondent's motion for reconsideration is nothing more than re-argument, in the interest of completeness, we will address each point in turn.

## I.    The first *du Pont* factor

As do many of our final decisions where the issue is likelihood of confusion, we started our likelihood of confusion analysis as follows:

> Our determination under Trademark Act Section 2(d) is based on an analysis of the probative facts in evidence that are relevant to the factors bearing on a likelihood of confusion. *See In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973); *see also Palm Bay Imp., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); and *In re Dixie Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by Section 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29

3

(CCPA 1976); *see also In re Azteca Rest. Enters., Inc.,* 50
USPQ2d 1209 (TTAB 1999).

We noted in our decision of September 2013, that as to *appearance*, these two marks are identical except for the first letter (**GEOWEB** versus **NEOWEB**). Inasmuch as the terms "Geo-"and "Neo-" appear to be perfectly rhyming, two-syllable prefixes having the identical "e•o" vowel pair, we concluded that the terms "Geoweb" and "Neoweb" are "strikingly similar in *sound*."

Furthermore, in comparing these respective marks under the first *du Pont* factor, we noted that we must consider the marks in their entireties as to both connotation and commercial impression in determining the similarity or dissimilarity between them:

> As to connotation, the prefix "Geo-" has the suggestion of "earth," while "Neo-" has a different meaning, often that of "new" or "revised." While applicant suggests that this distinction should be the end of this inquiry, we agree with opposer that prospective customers might well view "Neo-" as an intentional play on the word "Geo" – the more so inasmuch as applicant consistently touts its **NEOWEB** product as a later generation of products that improves significantly upon **GEOWEB** products. This combination of identical pronunciations and structure, and an almost intuitive connection to the earlier product is significant in this case, works to create a close association between the overall commercial impressions of the two marks used in a marketplace of legally identical, competing products ... .

Throughout the prosecution of this proceeding, applicant has emphasized the difference in the *connotations* of the prefixes of these respective marks. We acknowledged that "Geo-" has the suggestion of "earth," while "Neo-" means "new" or "revised." Although applicant argued that this dissimilarity in meaning alone

should be determinative in resolving the question of likelihood of confusion in its favor and hence, dismissing the opposition, we found otherwise.

We found, in addition to the fact that the terms "Geo-"and "Neo-" are strikingly similar in sound, that applicant's efforts to show its *bona fide* credentials and long experience in the industry repeatedly resulted in advertisements that touted its *New* version of the *Geo*web products. Hence, in making a determination about the all-important *commercial impressions* of the respective marks, we noted several different forces at work, each mutually reinforcing the impressions of a close relationship between the **GEOWEB** and **NEOWEB** as they appeared in the marketplace.

Our case law has also set up a converse relationship between the first and second *du Pont* factors: when the goods and/or services are legally identical, as is the case herein, "the degree of similarity [between the marks] necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992), *cert. denied* 506 U.S. 1034 (1992) (**CENTURY 21** for *inter alia*, insurance brokerage service confusingly similar to **CENTURY LIFE OF AMERICA** for insurance underwriting services); and *Starbucks U.S. Brands, LLC v. Ruben,* 78 USPQ2d 1741, 1752 (TTAB 2006) (finding **LESSBUCKS COFFEE** similar in appearance, sound, and overall commercial impression to **STARBUCKS** and **STARBUCKS COFFEE**). Hence, the above cited language confirms our focus on the fact that these respective marks are indeed being "used in a marketplace of legally identical, competing products."

5

Of course, in the larger scheme of applying the *du Pont* factors, after reviewing all the relevant factors from among the thirteen listed by the *du Pont* Court, the tribunal is then charged with carefully balancing all the relevant factors. At the time of this final balancing, the strength of the cited mark is certainly a relevant factor.

## II.    Factoring in the Strength of the cited marks

As suggested by applicant, we need to look to factors dealing with the strength of opposer's prior mark, namely, both its "commercial strength" (the fifth *du Pont* factor) and its "conceptual strength (the sixth *du Pont* factor).

As to the factor of commercial strength, while we found that opposer's **GEOWEB** marks are *not* "famous," we concluded that opposer's predecessor-in-interest was the

> … first company to offer commercially cellular confinement systems, and continues to be a prominent player in this industry after more than thirty years. … [O]pposer's **GEOWEB** marks have served as distinctive source indicators for its cellular confinement products for more than three decades."

Then, as to the sixth *du Pont* factor, we observed that while applicant had shown that both "geo-" and "-web" had been used by third-party competitors, no third party has been shown to have adopted or used a mark as similar to opposer's marks as is applicant's applied-for mark, and that absent a counterclaim to cancel these registrations, applicant could not collaterally attack these registrations.

6

Hence, as to the overall strength of opposer's **GEOWEB** marks, we discussed our relative weighing of the fifth and sixth *du Pont* factors. Accordingly, we found that opposer's **GEOWEB** mark represented a "well-established brand in this field sufficient to accord it a slightly wider scope of protection, despite any possible conceptual weakness," and we concluded that

> [w]hatever arguable weaknesses may have been inherent in opposer's selection in 1984 of the term "Geoweb" for geocells in the form of plastic "webbing," under Section 7 of the Lanham Act, and in keeping with more than thirty years of usage in this field, we accord the pleaded marks the scope of protection to which they are rightly entitled.

Then, finally in balancing together all the relevant *du Pont* factors, we found as follows:

> The goods, the channels of trade and classes of consumers herein are identical. Even if one concedes some inherent conceptual weakness in the trademark when opposer first adopted its mark in 1984, it has nonetheless become a widely-known and established brand, and the parties' marks involved herein are quite similar in appearance, sound and overall commercial impression. These factors, going in favor of a finding of likelihood of confusion, outweigh that which goes in applicant's favor, namely the care with which these goods will be purchased by fairly sophisticated professionals, and hence, we find that confusion is likely between opposer's **GEOWEB** marks and applicant's **NEOWEB** mark. To the extent we retain any doubt as to whether there is a likelihood of confusion, we resolve such doubt, as we must, in favor of opposer, the prior registrant. *In re Shell Oil Co.,* 992 F.2d 1204, 26 USPQ2d 1687, 1691 (Fed. Cir. 1993).

Hence, contrary to applicant's assertion in its request for reconsideration, the totality of our September 2013 decision shows that we did consider marketplace

conditions under several relevant *du Pont* factors in reaching our likelihood of confusion determination herein.

## III.    Failure to consider certain third-party trademark registrations

We turn then to applicant's final complaint. In our earlier decision (at 24, footnotes 72 and 73), we noted that we had given no consideration to a number of third-party applications and registrations placed into the record by applicant that had been abandoned, cancelled or expired. We have long held that cancelled or expired registrations are not evidence of anything except that they issued. *See* TBMP § 704.03(b)(1)(A) (June 2013) and cases cited therein.

Applicant cites, *inter alia*, to *Henry Siegel Co. v. M & R International Mfg. Co.*, 4 USPQ2d 1154 (TTAB 1987) in support of its claim of a Board error herein. However, we note that the defendant (Respondent M&R International) in the *Henry Siegel* case counterclaimed for cancellation of petitioner's registration for jeans, claiming that the **CHIC** mark claimed by plaintiff (petitioner Henry I. Siegel Co.) was merely descriptive of jeans. On this counterclaim, after reviewing respondent's dictionary definitions and articles from periodicals where the word "chic" was used in its ordinary dictionary sense, the Board also identified *seventeen* third-party trademark registrations placed into the record by respondent that were among the "most relevant" (*i.e.*, most similar to the marks at issue) of the many-more-than-seventeen third-party registrations offered in evidence. As noted by opposer, "[t]he Board [in *Henry Siegel*] did not, as Applicant argues, describe the [*four*] expired and cancelled registrations as 'among the most relevant evidence of record to show that the term …

8

has a descriptive significance'." Opposer's brief at 4 n2. Finally, in making the decision on likelihood of confusion in *Henry Siegel*, the Board held that petitioner was entitled to preclude the registration of respondent's mark **L.A. CHIC**, under § 2(d) of the Act, without citing back to any weakness in the term "Chic."

Accordingly, we find that the Board committed no errors in reaching our decision of September 27, 2013.

*Decision*: After due consideration of all the issues raised in applicant's motion for reconsideration, including any not specifically addressed herein, applicant's request for reconsideration is denied, and the Board adheres to its decision of September 27, 2013, sustaining the opposition and denying the registration of applicant's **NEOWEB** mark.

9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Appellant's Principal Brief was

served on July 21, 2014, on counsel of record via the Court's CM/ECF system and

via email.

/s/ Richard M. Klein
Richard M. Klein
FAY SHARPE LLP
The Halle Building, 5th Floor
1228 Euclid Avenue
Cleveland, Ohio 44115
Telephone: 216-363-9000
Facsimile: 216-363-9001

Attorney for Applicant-Appellant
P.R.S. Mediterranean Ltd.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Fed. Cir. R. 32(b), the undersigned attorney for Applicant-Appellant hereby certifies that the attached Appellant's Principal Brief is printed using proportionally spaced 14-point Times New Roman typeface and contains 8,542 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), as calculated using Word 2010.

/s/ Richard M. Klein
Richard M. Klein
FAY SHARPE LLP
The Halle Building, 5th Floor
1228 Euclid Avenue
Cleveland, Ohio 44115
Telephone: 216-363-9000
Facsimile: 216-363-9001

Attorney for Applicant-Appellant
P.R.S. Mediterranean Ltd.

PRSI 700020US02 764549 4